## In re MOODY.

### HAWKEYE LAND CO. v. EVANS.

(District Court, N. D. Iowa, E. D.    February 8, 1905.)

### No. 394.

1. BANKRUPTCY—CONVEYANCE WITH INTENT TO DEFRAUD—PURCHASERS IN GOOD FAITH.

It is incumbent on a purchaser of property from one who is in fact insolvent, and subject to be adjudged a bankrupt, to exercise ordinary prudence and diligence to ascertain whether or not the seller can make a transfer of the property that will not be in violation of the bankruptcy law; and where the sale was in fact made with intent to hinder, delay, or defraud his creditors, and within four months prior to his bankruptcy, the title of the purchaser can only be sustained as against creditors of the bankrupt under Bankr. Act July 1, 1898, c. 541, § 67e, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449], by showing that such diligence was exercised, and that the purchase was in good faith, and for a present fair consideration.

2. SAME.

A bankrupt was a retail merchant in a small town, practically his entire property consisting of his stock of goods. Within four months prior to his bankruptcy, and when insolvent, with intent to hinder and delay certain of his creditors, he sold and transferred his entire stock to a firm whose members resided in the same town, receiving therefor as the principal consideration a farm, which, at his request, was conveyed to his wife. As a further consideration, the purchasers paid a debt owing by him to a local bank, of which two of the purchasers were stockholders and one was president. Such bank also held a number of collections against the bankrupt, which were unpaid. The purchasers made no inquiry as to his financial condition or his purpose in selling, and the consideration paid was less than the fair value of the stock. *Held,* that they were not protected as purchasers in good faith, but the transfer was void under Bankr. Act July 1, 1898, c. 541, § 67e, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449].

In Bankruptcy. On petition of the trustee for review of the order of the referee sustaining the claim of the Hawkeye Land Company to the stock of merchandise, or the proceeds thereof, formerly owned by the bankrupt.

See 131 Fed. 525.

This matter was before the court at a former day. See 131 Fed. 525. Pursuant to the order then made, the Hawkeye Land Company, a copartnership, presented to the referee, within the time there fixed, its claim to the stock of goods owned by the bankrupt, resting such claim upon the ground

that it was a good-faith purchaser of the same from Moody on May 14, 1904, for a present fair consideration then paid. The trustee answered, in substance, that at the time of such purchase Moody was insolvent; that by such sale to the land company he intended to hinder, delay, and defraud his creditors; and that the land company so knew, or had reasonable cause to so believe. From the testimony taken upon the issues so presented it appears that at the time of such transfer Moody was indebted, as he testifies, as follows:

To Myrtle Moody, his wife, about................................. $1,700
To A. Moody, his father, about.................................... 2,760
To a Mr. Evans................................................... 240
To First State Bank of Hawkeye.................................. 400
To mercantile creditors, about.................................. 4,500

Total.................................................... $9,600

His only property was the stock of goods in question, which he valued at $7,000. S. H. Bevins and O. N. Bevins and A. B. Peters were copartners doing business at Hawkeye, a village of 500 or 600 inhabitants, in Fayette county, where they and Moody lived. Moody was a retail dealer in clothing and men's furnishings, and the land company was dealing in lands and stocks of merchandise, trading one for the other and selling on commission. A few days before May 14, 1904, Moody met S. H. Bevins and A. B. Peters on the street in Hawkeye, and asked them if they had any lands to trade for his stock of merchandise. Mr. Bevins said they had, and would see him again in a short time. The negotiations thus opened resulted in an agreement between them a few days later whereby the land company was to take Moody's stock of merchandise at $7,000, and convey to him 160 acres of land at $70 an acre, subject to a mortgage for $6,000, pay the debt of $400 owing by Moody to the First State Bank of Hawkeye, and pay him the remaining $1,400 in cash. An invoice of the stock was to be made, and if that, at cost price, fell below $7,000, the difference to be paid by the land company for the goods was to be so much less. An invoice was at once begun, and completed within two or three days; S. H. Bevins, A. B. Peters, and Moody, with an assistant, taking the same. The amount of this invoice is not shown, nor is there any evidence that it was less than $7,000, or that the goods were not of that value. At the completion of the invoice, on May 14th, a bill of sale of the goods was made by Moody to the land company; and A. B. Peters (who held the title of the land for the company) made a deed of the same, in which Myrtle Moody, wife of the bankrupt, was named as grantee; and S. H. Bevins took the bill of sale and deed to West Union, the county seat of Fayette county, nine miles away, in the afternoon of that day, and filed both for record; Moody paying the fee for recording the deed. Moody directed that the deed be made to his wife, but the testimony is in dispute as to when he did this. Bevins and Peters testify that when the deed was made Moody requested that the name of the grantee be left blank, saying that he did not then know to whom he wanted it to run, and they so left it, and authorized him to fill in the name of the person to whom he wanted the land to go. Moody, who was a witness for the land company, testified that he did not remember whether he told Bevins or Peters to make the deed to his wife or not; but on two former occasions he testified that he did tell them, or one of them, to make it to her, because he wished to protect her, or satisfy her, for what he was owing her; that she was worrying about the money she had let him have. Be this as it may, it is beyond dispute that if the name of Mrs. Moody was not in the deed when it was signed by Peters and wife, it was written therein very shortly after by Mr. Henderson, cashier of the First State Bank, who drew both the deed and the bill of sale, and before S. H. Bevins started with them to the recorder's office; and that Bevins and Peters both knew before the deal was closed or the land company had paid anything for the goods that Moody wanted the land deeded to some one other than himself, and that they consented to so deed it. The result of the transaction as closed is that the land company paid for the goods in the manner following:

160 acres of land (deeded to Mrs. Moody) at $70 an acre.......... $11,200
Subject to a mortgage, exclusive of interest.....................   6,000
                                                                  _____
    .  Net equity in the land.....,............................. $ 5,200
It assumed and paid the debt of Moody to the First State Bank of
    Hawkeye ....................................................     400
Paid Moody in cash.............................................      400
Gave to Moody its note, due July 1, 1904.......................    1,000
                                                                  _____
    Total...................................................... $ 7,000

The land was leased for the season of 1904 for $400, and the land company assigned the lease, and gave Moody the notes of the tenant for such rent. Bevins says that the lease was to go with the land. It was also agreed as a part of the transaction that Moody was to stay in the store, and continue to sell the goods at retail, until such time as the land company could dispose of the stock, and for his salary he was to have all that the goods sold for above the cost price; and Moody testifies that the cost price of the goods sold was to be applied upon the note of the land company to him when it reached $1,000. Moody remained in the store and continued selling the goods under this arrangement, until the stock was placed in the hands of the receiver, retaining as his salary all above the cost price of the goods sold, and depositing the cost price in the First State Bank of Hawkeye in the name of the Hawkeye Land Company. On May 14th, and for some time prior thereto, the mercantile creditors of Moody were pressing him for payment, and the First State Bank of Hawkeye and different attorneys had many of these claims for collection, and some had been sued. Mr. Henderson, cashier of the First State Bank, knew this, and had presented to Mr. Moody the claims received by that bank; and Moody had made various excuses to him for not paying them, and some were returned by the bank to the creditors. S. H. Bevins and O. N. Bevins were both stockholders of this bank. S. H. Bevins was its president, and was frequently in the bank, and examined its books whenever he desired or had occasion to do so. He was not its active manager, the cashier being such officer. He, his brother, and Mr. Peters all testify that they knew nothing of the claims held by the bank against Moody; that they did not know of Moody's insolvency, or of his intent to hinder, delay, and defraud his creditors in disposing of his goods; and that they made no inquiries of him or of any one else during the negotiations as to his financial condition, and made no investigation of any kind in regard thereto. Peters, when asked about this, said that he did not think they cared anything about Moody's indebtedness. Moody had the largest trade (of its kind, at least) in Hawkeye, and S. H. Bevins and Peters say that they supposed he was doing a good business. He gave as his reason for wanting to sell that trade was slack, and that he wanted to get a farm. He had a short time before offered to trade the stock to another for land, and Bevins or Peters knew of this. The land company had traded for this land within a year previous; paid $60 an acre in trade therefor; and S. H. Bevins and Peters testify that that was its fair value at the time of the transaction with Moody. Some of their witnesses estimate its value as high as $70 an acre, especially in trade; while the estimates of other witnesses vary from $45 to $65 an acre. The petition in bankruptcy was filed against Moody May 24, 1904; and he was adjudged bankrupt thereon July 23d following.

Upon these facts the referee found in favor of the land company, and ordered the trustee to turn the goods, or the proceeds of such as had been sold, over to the company. The trustee petitions for a review of this order.

H. J. Kearns and Lacy & Brown, for trustee.

Ainsworth, Dykins & Estey and Hurd, Lenehan & Kiesel, for Hawkeye Land Co.

REED, District Judge (after stating the facts as above). There is but one question to be determined, and that is, is the Hawkeye Land

Company a good-faith purchaser of the stock of goods from the bankrupt for a present fair consideration? In his certificate the referee says:

"The testimony clearly shows that at the time of the transaction with the Hawkeye Land Company, and for some time prior thereto, Edwin J. Moody was insolvent, * * * and it is difficult to understand why some of the members of said land company had no more information concerning the facts of insolvency of said Moody. * * *"

Such statement has led to a careful consideration of the entire testimony, and as to the insolvency of Moody it need only be said that it is ample to support the finding of the referee. It also conclusively shows that by the sale of the stock of merchandise to the land company Moody intended thereby to prefer his wife, Myrtle Moody, his father, A. Moody, and the First State Bank of Hawkeye, all of whom were his creditors, over his mercantile creditors, and to hinder, delay, and defraud such mercantile creditors. This is not now seriously disputed by the land company, but its contention is that it did not know of his insolvency, or his purpose in making the sale of his goods; that what it gave him for the stock was a present fair consideration; and that it is a good-faith purchaser of the property within the purview of section 67e of the bankruptcy act of July 1, 1898, c. 541, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449]. That section is as follows:

"That all conveyances, transfers, assignments, or incumbrances of his property, or any part thereof, made or given by a person adjudged a bankrupt under the provisions of this act subsequent to the passage of this act and within four months prior to the filing of the petition, with the intent and purpose on his part to hinder, delay or defraud his creditors, or any of them, shall be null and void as against the creditors of such debtor, except as to purchasers in good faith and for a present fair consideration. * * *"

By the plain language of this section, if Moody intended by the sale to hinder, delay, or defraud his creditors, the conveyance is null and void as to such creditors, except as against good-faith purchasers for a present fair consideration. It is not necessary that the purchaser should participate in the fraudulent purpose of Moody to render the transaction void as against the trustee. Such purpose being shown, it must then be made to appear that the purchase was in good faith, and for a present fair consideration, paid at the time of such purchase. The standard of good faith on the part of a purchaser is the same as that of a creditor in accepting payments or transfers of property as such, or as security, from an insolvent debtor; and it is uniformly held that each, under the bankruptcy law, is required, when dealing with one who is in fact insolvent and may be adjudged a bankrupt within four months, to exercise ordinary prudence and diligence to ascertain whether or not such insolvent can make a transfer of his property to him that will not be in violation of the bankruptcy law. In Wager v. Hall, 16 Wall. 584, it is said, at page 601 (21 L. Ed. 504):

"Purchasers [from an insolvent] are required to exercise ordinary prudence in respect to the title of the seller, and if they fail to investigate when put upon inquiry they are chargeable with all the knowledge it is reasonable to suppose they would have acquired had they performed their duty in that regard."

In Walbrun v. Babbitt, 16 Wall. 577, 21 L. Ed. 489, the Supreme Court, in speaking of the validity of a sale in bulk, by a retail merchant, of his entire stock of merchandise to one person, who was not a creditor, said:

"The usual and ordinary course of Mendelson's business was to sell at retail a miscellaneous stock of goods common to country stores in a small town in the interior of the state of Missouri. * * * But it is a wholly different thing when he sells his entire stock to one or more persons. This is an unusual occurrence, out of the ordinary mode of transacting such a business, is prima facie evidence of fraud, and throws the burden of proof on the purchaser to sustain the validity of his purchase. Sumerfield seeks to overthrow the legal presumption that Mendelson intended to commit a fraud on his creditors by showing that he paid full value for the goods in ignorance of the condition of Mendelson's affairs. But the law will not let him escape in this way. The question raised by the statute is not his actual belief, but what he had reasonable cause to believe. In purchasing in the way and under the circumstances he did, the law told him that a fraud of some kind was intended on the part of the seller, and he was put on inquiry to ascertain the true condition of Mendelson's business. This he did not do, nor did he make any attempt in that direction. Indeed, he contented himself with limiting his inquiries to the object Mendelson had in selling out and to his future purposes. Something more was required than this information to repel the presumption of fraud which the law raised in the mere fact of a retail merchant selling out his entire stock of goods. * * * In choosing to remain ignorant of what the necessities of his case required him to know, he took the risk of the impeachment of the transaction by the assignee in bankruptcy in case Mendelson should, within the time limited in the statute, be declared a bankrupt."

That this transaction between Moody and the land company was entirely out of the usual and ordinary course of business of Moody —a transfer by him of all his property; the giving of a preference to the First State Bank, of which two members of the land company were stockholders and one of them its president; the placing by the land company, at the request of Moody, of the entire equity in the land, which was the greater part of the consideration it paid for the goods, beyond the reach of mercantile creditors; all of which was actually known to the land company—cannot be doubted.

In Toof v. Martin, 13 Wall. 40, 20 L. Ed. 481, it is said:

"It is a general principle that every one must be presumed to intend the necessary consequences of his acts. The transfer, in any case, by a debtor, of a large portion of his property, while he is insolvent, to one creditor, without making provision for an equal distribution of its proceeds to all his creditors, necessarily operates as a preference to him, and must be taken as conclusive evidence that a preference was intended, unless the debtor can show that he was at the time ignorant of his insolvency, and that his affairs were such that he could reasonably expect to pay all his debts. * * * The burden of proof is upon him in such case, and not upon the assignee or contestant in bankruptcy. * * * The statute, to defeat the conveyances, does not require that the creditors should have had absolute knowledge on the point, nor even that they should, in fact, have had any belief on the subject. It only requires that they should have had reasonable cause to believe that such was the fact. And reasonable cause they must be considered to have had when such a state of facts was brought to their notice in respect to the affairs and pecuniary condition of the bankrupts as would have led prudent business men to the conclusion that they could not meet their obligations as they matured in the ordinary course of business."

Buchanan v. Smith, 16 Wall. 277, 21 L. Ed. 280, Dutcher v. Wright, 94 U. S. 553, 24 L. Ed. 130, and Bank v. Cook, 95 U. S. 343, 24 L. Ed. 412, are to the same effect.

Counsel for the land company say "that it can make no difference whether the Hawkeye Land Company knew or did not know of the financial condition of Edwin J. Moody, but, in order to set aside the conveyance, it is necessary that the evidence show that that company knew that the conveyance was being made to it with a view to effect some purpose prohibited by the bankruptcy act"; and Tiffany v. Boatman's Institution, 18 Wall. 375, 21 L. Ed. 868, is cited in support of this proposition. That case and the above quotation from the opinion therein must be limited to the facts upon which it is based, and of which the court was speaking, which are that the assignee in bankruptcy was attempting to recover from a creditor the full amount, principal and interest, of a loan paid by the bankrupt to such creditor upon a usurious contract, because, as he claimed, the payment amounted to a preference, was fraudulent, and that the usury rendered the whole transaction void. The loan was made by the bankrupt in an effort to continue his business, and the money borrowed was applied by him to the payment of a prior debt which was secured by a large amount of collaterals. The payment of such debt released those collaterals, and the bankrupt's estate was not diminished or impaired in the least by the transaction, but was in fact benefited thereby. The court says:

"There is nothing in the bankrupt law which interdicts the lending of money to a man in Darby's condition, if the purpose be honest and the object not fraudulent. And it makes no difference that the lender had good reason to believe the borrower to be insolvent, if the loan was made in good faith, without any intention to defeat the provisions of the bankrupt act. It is not difficult to see that in a season of pressure the power to raise ready money may be of immense value to a man in embarrassed circumstances. With it he might be saved from bankruptcy, and without it financial ruin would be inevitable. If the struggle to continue his business be an honest one, and not for the fraudulent purpose of diminishing his assets, it is not only not forbidden, but is commendable, for every one is interested that his business should be preserved."

It is plain that the case is not an authority in support of the proposition that under the present law a retail merchant actually insolvent may convey his entire property, even for a present fair consideration, with a view of closing out his business, to one who, by the slightest inquiry or investigation, may know of his insolvent condition, and who does in fact know that by such conveyance the bankrupt prefers certain of his creditors, and causes the greater part of what he is to get for his property to be placed by the purchaser beyond the reach of other creditors. See In re Pease (D. C.) 129 Fed. 446, a case affirmed by the Court of Appeals for the Sixth Circuit. It may be conceded that mere suspicion on the part of the members of the land company that Moody was insolvent, or that he intended by the transfer to hinder, delay, and defraud his creditors, is not sufficient to avoid the transaction between them. Grant v. Bank, 97 U. S. 80, 24 L. Ed. 971; In re Goodhile (D. C.) 130 Fed. 471. But, giving due weight to the tes-

timony of the several members of the land company that they did not know of the insolvency of Moody, or of his purpose to defraud his mercantile creditors by the transfer to the land company of his entire property, the conclusion from the whole evidence is unavoidable that S. H. Bevins and A. B. Peters did actually know that by the transfer Moody did give and intended to give a preference to the First State Bank of Hawkeye, one of his creditors, and of which bank both S. H. Bevins and O. N. Bevins were stockholders and S. H. Bevins president, and that the land company aided him in so doing; that Moody requested of Mr. Bevins and Mr. Peters that the land, which was the greater part of what he was to get for his goods, be conveyed by the land company to some one other than himself; that they agreed with him to, and did in fact, do so; that Moody was selling his entire property with a view of closing out and discontinuing his business. These are not mere suspicions on the part of Mr. Bevins and Mr. Peters, but facts actually known to them; and they are ample to put them, as prudent business men, upon inquiry as to the solvency and purpose of Moody in selling the goods, and whether or not he could convey them to the land company without violating the provisions of the bankruptcy law. Had they made the slightest investigation or inquiry of Mr. Henderson, the cashier of the bank of which Mr. Bevins was president, or of Mr. Moody, as to his indebtedness, and when it was due, or asked for an inspection of his books that they might ascertain this, there is no doubt that they would have discovered the hopeless insolvency of Moody, and his fraudulent purpose in giving the bank a preference, and in causing the land to be so conveyed, by the land company, as to place it beyond the reach of his creditors other than his wife and his father. By failing to make such inquiry and investigation the land company should not be held to be a good-faith purchaser of this stock of goods.

Again, the land company had possession of the invoice of this stock of merchandise which had been taken, and failed to produce it in evidence, or offer any evidence that the goods were not worth what it agreed to pay for them, to wit, $7,000. Under any fair valuation of the land as shown by its own witnesses and by the testimony of Bevins and Peters, it cannot be held to exceed in value $60 an acre, what it paid for it less than a year prior to this transaction with Moody. At this figure the value of the land would be $9,600. Deduct the mortgage, exclusive of interest, $6,000, and the value of the equity is $3,600, but a trifle more than 50 per cent. of the value of the goods. This of itself should have led Bevins and Peters to inquire why Moody was closing out a business that both say they supposed was good, and why he was willing to sell his stock of merchandise at about 50 per cent. of its value.

It follows that the order of the referee should be reversed, and he will direct the trustee to retain possession of the goods and distribute the proceeds of their sale among the creditors of Moody as required by the bankruptcy act.

It is ordered accordingly.