## In re KNOPF.

(District Court, D. South Carolina.   March 3, 1906.)

1. BANKRUPTCY—CONVEYANCE WITH INTENT TO DEFRAUD—VALIDITY.

The sale by a retail merchant of his entire stock is a transaction out of the ordinary course of his business, which puts the purchaser on inquiry to ascertain the true condition of the seller's business and circumstances, and where the seller was insolvent, and within four months thereafter was adjudged a bankrupt, and the sale was in fact made to hinder, delay, or defraud creditors, in order to sustain his title, under Bankr. Act. July 1, 1898, c. 541, § 67e, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449], the burden rests on the purchaser to show that he took all reasonable and proper steps to ascertain the seller's financial condition and bought in good faith and for a present fair consideration.

2. SAME—JURISDICTION OF COURT—PROPERTY IN POSSESSION OF ADVERSE CLAIMANT.

Whenever, after the filing of a petition in bankruptcy, it appears to be necessary for the preservation of property claimed to be a part of the bankrupt's estate, it is within the jurisdiction of the court to order the marshal, or a custodian, to take possession of such property, although in possession of an adverse claimant, pending the adjudication of title; such proceeding being one in bankruptcy, and not a controversy at law or in equity, within the meaning of Bankr. Act. July 1, 1898, c. 541, § 23a, 30 Stat. 552 [U. S. Comp. St. 1901, p. 3431.]   And

a petition duly verified, which avers that the property consists of a stock of merchandise, and that it was transferred to the alleged bankrupt for the purpose of hindering, delaying, and defrauding his creditors, and sets forth facts tending to show that the transfer was void under the bankruptcy act, that the purchaser is financially irresponsible, and that there is danger that the property will be lost to the estate without the interposition of the court, is sufficient to make it the duty of the court to exercise such jurisdiction; but the petitioner in such case should be required to give a bond to protect the rights of the claimant.

In Bankruptcy. On petition for review of action of referee.

Jacob Gazan and Jas. A. Willis, for creditors.

Bates & Simms, for vendees.

BRAWLEY, District Judge. A petition in involuntary bankruptcy was filed October 5, 1905, by creditors, alleging that Isaac Knopf was insolvent, and that for the purpose of hindering, delaying and defrauding his creditors he had sold out his stock of merchandise in two stores at Fairfax, one on Hampton avenue to W. E. Harter, and the other, on Railroad avenue, to C. H. Sanders. Upon a certificate of the clerk that the district judge was temporarily absent from the state, this petition was referred to R. A. Ellis, Esq., referee at Barnwell, and immediately thereafter the creditors filed with the referee an ancillary petition setting forth the insolvency of Knopf; that he was greatly indebted, and that a large part of his indebtedness had been incurred within the preceding 60 days for merchandise purchased; that the stock of merchandise on Railroad avenue, valued at over $4,000, had been transferred to one C. H. Sanders; that petitioners, after a diligent inquiry, had been unable to ascertain the price for which said alleged transfer had been made; that the same was not in due course of trade, and was for the purpose of delaying, hindering, and defrauding; that said Sanders had little or no means; that he had no real estate, and that all of his personal property returned for taxation was valued at $150, and averred that said pretended sale was in pursuance of a conspiracy to defraud creditors and that said property was in truth and in law the property of Knopf, and that said Sanders was holding for the benefit of Knopf, who had refused to pay over any part of the purchase money to his creditors; that Sanders was selling and converting the merchandise into money without regard to actual value; and that, owing to the necessary delay in the appointment of a trustee, it was necessary that a custodian be appointed to hold said property. The referee thereupon appointed J. Allen Tobin custodian of the stock of goods in the store on Railroad avenue, directed him to give bond in the sum of $2,000 to have an inventory made of such stock of merchandise, and to insure the same, and that Knopf and Sanders show cause on October 17th why the prayer of petition should not be granted. Sanders appeared by attorney, who filed a return stating that he had purchased the stock of merchandise on September 30th for $3,000 in cash, denied all collusion, or that he held as agent for Knopf; that he had purchased in good faith, and alleged that he was the owner of the goods, which were valued at $3,500 to $4,000; that the bond of the custodian,

$2,000, was inadequate and not sufficient to protect Sanders. The referee thereupon ordered the custodian to execute another bond in the sum of $4,000, and on October 21st began to take testimony in the cause. Sanders, Knopf, Harter, and other witnesses were examined. Knopf was duly adjudged bankrupt on November 8th, and at a meeting of creditors held January 8th, Tobin was elected trustee, and by order of the referee was ordered to turn over the property held by him as custodian to himself as trustee of the creditors. On November 25th the referee filed a report, announcing his conclusion, which he says was based mainly on the testimony of Sanders, and influenced by the rest of the testimony that Sanders was not the bona fide purchaser of the stock of merchandise, that he was a person of limited means, owning no real estate; that he had worked a small farm, borrowing money and getting supplies by mortgages and other liens; that he had in his employment at the store J. J. Knopf, brother of Isaac, whose alleged peculations had been given by the latter as a reason for selling out; and that the testimony showed that he had consulted with said J. J. Knopf and seemed to rely upon him. He further directed that any one who claimed the merchandise in question should file his claim before January 23, 1906, and the case has been heard upon a petition to review the findings of the referee.

The main question presented and discussed at the hearing of said petition was that the referee was without jurisdiction to make the order directing a custodian to take possession of the stock of merchandise. This objection to jurisdiction had been taken before the referee in argument upon the hearing before him. It was not made upon the return to the rule to show cause. It appears from the testimony that Isaac Knopf was a retail merchant at Fairfax, a small town in Barnwell county, having two stores; that he had represented to parties from whom he was desiring to purchase goods on August 18, 1905, that his stock of merchandise was of the value of $6,000; that on September 7th he made a like statement, showing that he had a stock of merchandise valued at $8,000, and good accounts valued at $800, and that his indebtedness was inconsiderable. It further appears that during the late summer and autumn of that year he had purchased merchandise of the value of $5,000 or $6,000 and that on September 30th merchandise accounts to the amount of $5,000 or $6,000 were due and unpaid, and that it does not appear that any of these accounts have been paid, or that he has or had on September 30th any other property than the merchandise above mentioned. A part of this stock was in a store on Hampton avenue, which store was in charge of his brother, J. J. Knopf, who had failed in business two years before. This stock of merchandise, valued at from $2,000 to $2,500, was offered to W. E. Harter, a merchant at Fairfax, on Friday, September 29th at $1,500, and on the following morning Harter bought the same for $1,500. Sanders testifies that he had before that date desired to go into the mercantile business, and that on Thursday, September 28th, Knopf offered to sell him his store on Railroad avenue; that on Friday he had gone into town and looked at it, and on Saturday morning offered $3,000 for it; that he had $1,500 of his own, and that he borrowed $1,500 from W. E. Harter, and

paid that sum to Knopf. The testimony further shows that no inventory of the stock in either store was taken; that no inquiry was made of Knopf as to his financial condition. The only reason given by Knopf to Sanders for his desire to sell out was that he was not making any money, and that he suspected that goods in the Hampton avenue store were being sold, and that he was getting no proper returns of such sales; that store, it will be remembered, was in charge of his brother, J. J. Knopf. Isaac Knopf was examined at the hearing, and failed to give any satisfactory explanation of his disposition of the moneys paid him September 30th. He testifies that $1,500 of this money was paid to one Loadholt upon a note, and it appears that Loadholt was one of the witnesses of the transfer of the stock of goods to Sanders. He further testifies that about $700 was paid to his brother, J. J. Knopf, upon an alleged indebtedness, and that he sent to his brother who was sick at Hot Springs, Ark., the sum of $600, and that he paid out some money to local creditors at Fairfax in sundry small amounts. No money was paid to his merchandise creditors, some of whom went to Fairfax about this time and endeavored to collect claims which were just maturing. About $6,000 of claims have been proved, and that Isaac Knopf was absolutely insolvent at the time of the alleged sales and transfers of his merchandise is not controverted. It is plain that such sales were made with the intent and purpose on his part to hinder, delay and defraud his creditors. Any such conveyance, by the terms of the act, is declared to be null and void, as against the creditors of such debtor, except as to purchasers in good faith and for a present fair consideration.

In Walbrun v. Babbitt, 16 Wall. 581, 21 L. Ed. 489, which was a case arising under the Bankruptcy Act of 1867, the court says:

"Section 35 of the bankrupt law (14 Stat. 534) condemns fraudulent sales equally with fraudulent preferences, and declares that, if such sales are not made in the usual and ordinary course of business of the debtor, they should be prima facie evidence of fraud. The usual and ordinary course of Mendelson's business was to sell at retail a miscellaneous stock of goods common to country stores in a small town in the interior of the state of Missouri. It was to conduct a business of this character that the goods were sold to him. and, as long as he pursued the course of a retailer, his creditors could not reach the property disposed of by him, even if his purpose at the time were to defraud them. But it is wholly a different thing when he sells his entire stock to one or more persons. This is an unusual occurrence, out of the ordinary mode of transacting such business, is prima facie evidence of fraud, and throws the burden of proof on the purchaser to sustain the validity of his purchase. Summerfield seeks to overthrow the legal presumption that Mendelson intended to commit a fraud on his creditors by showing that he paid full value for the goods in ignorance of the condition of Mendelson's affairs, but the law will not let him escape in this way. The question raised by the statute is not his actual belief, but what he had reasonable cause to believe. In purchasing in the way and under the circumstances he did, the law told him that a fraud of some kind was intended on the part of the seller, and he was put on inquiry to ascertain the true condition of Mendelson's business. This he did not do, nor did he make any attempt in that direction. Indeed he contented himself with limiting his inquiries to the object Mendelson had in selling out, and his future purposes. Something more was required than this information to repel the presumption of fraud, which the law raised in the mere fact of a retail merchant selling out his entire stock of goods. If this sort of information could sustain a sale, the provision of the bankruptcy law we are consider-

ing would be no protection to creditors, for any one in Mendelson's situation, and with the purpose he had in view, would be likely to give the party with whom he was dealing a plausible reason for his conduct. The presumption of fraud arising from the unusual nature of the sale in this case can only be overcome by proof on the part of the buyer that he took the proper steps to find out the pecuniary condition of the seller. All reasonable means, pursued in good faith, must be used for this purpose. If Summerfield had employed any means at all directed to this end, he would have discovered the actual insolvency of Mendelson. In choosing to remain ignorant of what the necessities of his case required him to know, he took the risk of the impeachment of the transaction by the assignee in bankruptcy in case Mendelson should, within the time limited in the statute, be declared a bankrupt."

In this case Mendelson had sold the stock of goods to Walbrun & Co., and Ritter, a member of the firm who lived in another town, went to Kingsville, where Mendelson's store was, to take possession, and the court proceeds:

"Without learning anything, or seeking to learn anything, beyond the facts that the goods suited him, and Mendelson wanted to change his business, he completed the purchase, and immediately transferred the stock to the store of the defendants in Chillicothe. If this sale can be upheld, the law which declared the title of Summerfield prima facie fraudulent may be easily rendered of no benefit, for all that would be necessary, for a person buying property out of the ordinary course of business of the seller to place it out of the reach of creditors, would be, as soon as he had consummated his purchase, to sell to another, who would acquire a good title, no matter how presumptively invalid the title of his vendor might be. It needs no argument to prove that, if the law against fraudulent sales may be evaded in this way, it would furnish no sort of protection to creditors. Ritter, when he purchased, knew the nature of Summerfield's title, because he knew, or ought to have known, that a retail dealer like Mendelson, in selling out his entire stock, was presumptively guilty of intending to defraud his creditors, if it should turn out that he had any."

This is familiar doctrine, and the rule is of general application that any unusual transaction, sufficient to excite attention and put a party on inquiry, is notice of everything to which such inquiry would have led, and that any ignorance of the fact due to negligence is equivalent to knowledge in fixing the rights of the parties. It is thus stated in Wade on Notice (2d Ed.) §§ 31–33:

"When a party, having knowledge of such facts as would lead any honest man, using ordinary caution, to make further inquiries, does not make, but studiously avoids making, such previous inquiries, he must be taken to have notice of those facts which, if he had used such ordinary diligence, he would readily have ascertained."

In Lowry v. Pinson, 2 Bailey (S. C.) 328, 23 Am. Dec. 140, the court says:

"There is perhaps no principle of more universal application than that fraud avoids all contracts between the parties themselves, if one impose on the other, and between them and third persons, where they conspired to defraud others, and cases might arise where that could as readily be effected when a full and fair price is paid, as when nothing is paid. One rich in lands, houses, or other permanent property resolves not to pay his debts, and another, knowing this, treats with him, and purchases his whole estate at a fair and full price, and thus enables him to fly from the claims of his creditors. Now, although the purchaser has gained no advantage, he

has enabled the debtor to evade the payment of his debts, and the effect upon the creditors is precisely the same as if nothing had been paid."

In Maybin v. Kirby, 4 Rich. Eq. (S. C.) 114, the court says:

"A plea of purchase for valuable consideration without notice is not protection against an adverse claim of which the purchaser might have had notice by using due diligence in investigating the title."

The general rule in equity is that, whenever a legal title to property has been obtained in circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, a constructive trust is impressed on the property that is acquired, in favor of those who are truly and equitably entitled to the same, or as stated in Angle v. Chicago, etc., Railway, 151 U. S. 26, 14 Sup. Ct. 250, 38 L. Ed. 55:

"It is familiar doctrine that a party who acquires title to property wrongfully may be adjudged a trustee ex maleficio in respect to that property."

I am of opinion that the facts disclosed in the testimony sustain the conclusion of the referee that the transaction between Knopf and Sanders was null and void, and in contravention of the bankrupt act; but, for reason hereinafter stated, further opportunity will be given to Sanders to establish title to the property.

The jurisdiction of the referee to make orders complained of will now be considered. Section 1 of the bankrupt act (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3419]), among the definitions, provides: "(7) Court shall mean the court of bankruptcy in which the proceedings are pending, and may include the referee." Section 38 (30 Stat. 555 [U. S. Comp. St. 1901, p. 3436]) invests referees, subject always to review by the judge, with jurisdiction to "(3) exercise the powers of the judge for the taking possession and releasing of the property of the bankrupt in the event of the issuance by the clerk of a certificate showing the absence of the judge from the judicial district; (4) perform such part of the duties * * * as are by this act conferred on courts of bankruptcy, and as shall be prescribed by rules or orders of the courts in bankruptcy, of their respective districts, except as herein otherwise provided." These provisions, in the circumstances stated, authorize the referee to exercise the powers of the court, which, as provided in section 2 (30 Stat. 546 [U. S. Comp. St. 1901, p. 3421]), are authorized "(3) to appoint receivers, or the marshals, upon application of parties in interest in case the court shall find it absolutely necessary for the preservation of estates to take charge of the property of bankrupts after the filing of the petition, and until it is dismissed or the trustee is qualified; * * * (6) to bring in and substitute additional persons or parties in proceedings in bankruptcy when necessary for the complete determination of the matter in controversy; (7) cause the estates of bankrupts to be collected, reduced to money, and describe and determine controversies in relation thereto, except as herein otherwise provided."

General order 12 (89 Fed. vii, 32 C. C. A. xvi) provided that, after the order of reference reaches the referee, "all the proceedings, except

such as are required by the act, or by the general orders to be had before the judge, shall be had before the referee."

In White v. Schloerb, 178 U. S. 542, 20 Sup. Ct. 1007, 44 L. Ed. 1183, it is held that referees in aid of the court of bankruptcy exercise "much of the judicial authority of that court."

In Bryan v. Bernheimer (U. S.) 21 Sup. Ct. 557, 45 L. Ed. 814, the court ordered the marshal to take possession of property which the bankrupt, nine days before the filing of the petition in bankruptcy against him, had assigned to one Davidson in a general assignment of all of his property for the benefit of his creditors, and which Davidson had sold to Bernheimer. The petitioning creditors, before the appointment of a trustee, had applied to the court for an order to the marshal to take possession of the property, alleging that it was necessary for the interest of the bankrupt's creditors. The property was taken possession of by the marshal, and notice was given to the purchaser to appear in 10 days and propound his claim. The purchaser came in, stated that he had bought the property for cash in good faith of the assignee, and praying that the creditors be remitted to their claim against the assignee for the price, etc. The court held that the summary proceeding was properly entertained, that the purchaser had no title in the property superior to the bankrupt estate, and that equities between him and the creditor might be determined by the district judge bringing in the assignee if necessary. The case of Bardes v. Bank (U. S.) 20 Sup. Ct. 1000, 44 L. Ed. 1175, cited by the attorneys for Sanders, is therein referred to, and it is observed that the remark that the powers conferred on the courts of bankruptcy, authorizing receivers or marshals to take charge of the property of the bankrupt for its preservation until a trustee was appointed, "can hardly be considered as authorizing the forcible seizure of such property in the possession of an adverse claimant," was an inadvertence, and upon a question not arising in the case then before the court.

In Mueller v. Nugent, 184 U. S. 1, 22 Sup. Ct. 269, 46 L. Ed. 405, the court considered the question whether the bankruptcy court had the power to compel the bankrupt or his agent to deliver up the money or assets, on petition and rule to show cause, and whether the trustee was bound to resort to a plenary suit. The court says:

"If it be so, the grant of jurisdiction to cause the estates of bankrupts to be collected, and to determine controversies relating thereto, would be seriously impaired, and in many respects rendered practically inefficient. The bankruptcy court would be helpless, indeed, if the bare refusal to turn over could conclusively operate to drive the trustee to an action to recover as for an indebtedness or a conversion, or to proceedings in chancery at the risk of the accompaniments of delay, fraud, and expense intended to be avoided by the simpler methods of the Bankrupt Law."

And again:

"But suppose that the respondent had asserted that he had the right to possession by the reason of a claim adverse to the bankrupt, the bankruptcy court had the power to ascertain whether any basis for such a claim actually existed at the time of the filing of the petition. The court would have been bound to enter upon that inquiry, and in so doing would have undoubtedly acted within its jurisdiction."

In Whitney v. Wenman, 198 U. S. 539, 25 Sup. Ct. 778, 49 L. Ed. 1157, the court reviews all the cases above cited and others, and says:

"We think the result of these cases is, in view of the broad powers conferred in section 2 of the bankruptcy act, authorizing the bankruptcy court to cause the estate of the bankrupt to be collected, reduced to money, and distributed, and to determine controversies in relation thereto, and bring in and substitute additional parties when necessary for the complete determination of the matter in controversy, that, when the property has become subject to the jurisdiction of the bankruptcy court as that of the bankrupt, whether held by him or for him, jurisdiction extends to determine controversies in relation to the disposition of the same, and the extent and character of the liens thereon or rights therein."

The precise question presented for determination is whether the bankruptcy court can by a summary proceeding seize property not in possession of the bankrupt, or whether it was necessary for that court to wait until a trustee was appointed, and then direct such trustee by a plenary proceeding to proceed to recover the same. The allegations of the petition, which was verified, were that Knopf was insolvent; that the transfer of his stock of goods to Sanders was with intent to hinder, delay and defraud creditors; that it was merely colorable; that Sanders, the alleged purchaser, was a person of small substance; that he was rapidly disposing of the goods; and that the appointment of a custodian was necessary to the preservation of the property. The petition did not ask the seizure of the property conveyed to Harter because, as averred therein, Harter was abundantly solvent and able to respond for the value of the goods transferred, and the petitioning creditors had proposed an order directing the trustee to bring suit against him. The question presented is not without difficulty, and its solution depends upon whether this is a proceding in bankruptcy as such, or whether it is a controversy at law or in equity, within the meaning of section 23 (30 Stat. 552 [U. S. Comp. St. 1901, p. 3431]), which provides for the jurisdiction in all controversies at law and in equity, as distinguished from proceedings in bankruptcy between trustees as such and adverse claimants concerning the property acquired or claimed by the trustees. Subdivision "b" of said section, as amended, provides that "suits by the trustee shall only be brought or prosecuted in the courts where the bankrupt whose estate is being administered by such trustee might have brought or prosecuted them if proceedings in bankruptcy had been instituted, unless by consent of the proposed defendant," except suits for the recovery of property under section 60, subd. "b," and section 67, subd. "e" (3 Stat. 562, 565 [U. S. Comp. St. 1901, pp. 3445, 3449]). Section 60, subd. "b," relates to cases where the bankrupt has given a preference which in certain cases is voidable by the trustee, and section 67, subd. "e," relates to conveyances, transfers of property by a bankrupt within four months prior to the filing of the petition, with intent and purpose on his part to hinder, delay, or defraud his creditors. All such conveyances by that section are declared null and void against creditors of the bankrupt debtor, and such property shall pass to the trustee, and be by him reclaimed and recovered for the benefit of the creditors of the bankrupt. It will be seen that section 23 by terms distinguishes "proceedings in bankruptcy" from "controversies at law and in equity," but

the exact line of demarcation between the two is not fixed by the act, and we are compelled to look to the adjudicated cases for light upon this point.

The Circuit Court of Appeals of the Eighth Circuit, in Re Young, 111 Fed. 158, 49 C. C. A. 283, considered a case where the marshal under order of the court, had taken possession of the property of one Bender, who had been adjudged a bankrupt March 12, 1901, under an involuntary petition. Previous to the institution of bankruptcy proceedings, about October 8, 1900, Bender had executed mortgages upon this property which had been recorded, but the property was still in his possession. Subsequently the mortgagee appeared in the District Court and moved that the marshal be required to surrender the property. It was held that the District Court properly issued the order directing the marshal to take possession of the property and "that under that order the marshal had the right to take possession of such property, although it was found in the custody of third parties and was claimed adversely by them"; and that the District Court had the power to require the petitioner to assert his title to the property by a plenary action or by an intervention.

The case of Bryan v. Bernheimer, is cited and certain cases arising under the bankrupt act of 1867, among them Sharpe v. Doyle, 102 U. S. 689, 26 L. Ed. 277, wherein Judge Miller says:

"The act of Congress was designed to secure the possession of the property of the bankrupt so that it might be administered under proceedings in bankruptcy. Between the first steps initiating them and the appointment of the assignee a considerable time often elapses, during which the effects of the bankrupt, especially in a case commenced by creditors, may be surreptitiously conveyed beyond the reach of the court or of the assignee, who when appointed is entitled to the possession of them. If the bankrupt does not voluntarily aid the court, or is inclined to defeat the proceedings, he can, with the aid of friends or irresponsible persons, sell his removable property and put the money in his pocket, or to secrete his goods or remove them beyond the reach of the assignee or the process of the court, and thus defy the law. The evidence in this case shows the manner in which this can be done. It was the purpose of the act of Congress to remedy this evil. It therefore provides that, as soon as the petition in bankruptcy is filed, the court may issue to the marshal a provisional warrant directing him to take possession of all the property and effects of the bankrupt and hold them subject to further order of the court. To have limited this right or duty of seizure to such property as he might find in the actual possession of the bankrupt would have manifestly defeated in many instances the purpose of the writ. There is therefore no such limitation expressed or implied."

A later case, under the same act, (Feibelman v. Packard, 109 U. S. 421, 3 Sup. Ct. 289, 27 L. Ed. 984), is to the same effect, holding "that a District Court of the United States sitting in bankruptcy has jurisdiction to order the seizure and detention of goods, the property of the bankrupt, although in the possession of another under claim of title."

In re Rochford, 124 Fed. 182, 59 C. C. A. 388, the District Court of South Dakota had directed the seizure by its receiver of a stock of goods covered by chattel mortgage. The sheriff of the county in which the goods were situated, by direction of Rochford, seized the property under the chattel mortgage. The District Court then by order directed the sheriff to surrender the property to its receiver,

and the referee made an order that the petitioner, Rochford, should assert and propound to him any right, title, or claim in the mortgaged goods. This order was served upon Rochford, who appeared and objected to the jurisdiction of the court. The referee disregarded the objections to his jurisdiction and adjudged that the chattel mortgage to Rochford was void as against the creditors of the bankrupt. In that case Rochford was a citizen of the state of Iowa, and the court says that, if the controversy between him and its trustee in bankruptcy is a controversy at law or in equity, as distinguished from proceedings in bankruptcy, the concession must be made that the jurisdiction to determine it was not in the District Court of South Dakota, but in the United States Circuit Court of Iowa, or in some state court which had jurisdiction of the mortgagee, Rochford. Upon the case as presented the court held that this was a proceeding in bankruptcy, as distinguished from a controversy at law or equity, within the true construction of section 23, and the ground of decision seems to be that. in all cases in which the court finds it absolutely necessary for the preservation of the estate to take possession of the property from the adverse claimant by means of its receiver, the subsequent determination of the issue raised between the trustee and the adverse claimant is a proceeding in bankruptcy.

In Re Moody, 131 Fed. 525, in the District Court of Iowa, the Hawkeye Land Company claimed to be the purchaser in good faith of a stock of merchandise from Edward J. Moody, and that it was in actual possession prior to the filing of the petition in bankruptcy, and that the court of bankruptcy therefore had no jurisdiction to summarily take possession of such property from it. After reviewing the cases, the court held:

"That the bankruptcy court had jurisdiction to summarily take possession of this stock of merchandise from Hawkeye Land Company, under clause 3 of section 2 of the bankruptcy act, in case it was necessary to do so to preserve it to the estate of the bankrupt; that the allegations of the ancillary petition in effect are that such property in fact belonged to Edward J. Moody, and are sufficient upon which to base a finding that it was necessary for the court to take possession of it in order to preserve it to his estate in bankruptcy, in case he was such owner and should be adjudged bankrupt; that the order appointing a receiver and directing him to take possession of such property is in effect a finding that it was necessary to do so. The result is that by that finding and order, and the action of the receiver thereunder, the court of bankruptcy has reduced the property to its actual custody. This, however, does not determine the actual ownership of the same."

The motion of the Hawkeye Land Company for the release of the property was overruled, and it was required to propound its claim to it before the referee at a day fixed. This case came up again before the same court on a petition of the trustee for review of the order of the referee sustaining the claim of the Hawkeye Land Company to the stock of merchandise, and is reported in 134 Fed. 628, where the court considered the question whether the land company was a bona fide purchaser, within the purview of section 67e of the bankruptcy act, and the court says:

"By the plain language of this section, if Moody intended by the sale to hinder, delay, or defraud his creditors, the conveyance is null and void

as to such creditors, except as against good faith purchasers for a present fair consideration. It is not necessary that the purchaser should participate in the fraudulent purpose of Moody to render the transaction void as against the trustee. Such purpose being known, it must then be made to appear that the purchase was in good faith, and for a present fair consideration, paid at the time of such purchase. The standard of good faith on the part of the purchaser is the same as that of a creditor in accepting payment or transfers of property as such or as security from an insolvent debtor, and it is uniformly held that each, under the bankruptcy law, is required, in dealing with one who is in fact insolvent and may be adjudged a bankrupt within four months, to exercise ordinary prudence and diligence to ascertain whether or not such insolvent can make a transfer of his property to him that will not be in violation of the bankruptcy law. In Wager v. Hall, 16 Wall. 584, 601, 21 L. Ed. 504, it is said: 'Purchasers from an insolvent are required to exercise ordinary prudence in respect to the title of the seller, and, if they fail to investigate when put upon inquiry, they are chargeable with all the knowledge that it is reasonable to suppose they would have acquired had they performed their duty in that regard.' "

It also cited the case of Walbrun v. Babbitt, which has been already referred to.

The result of my examination of the cases is that, wherever it appears that it is necessary for the preservation of the property claimed to be a part of the bankrupt's estate, after petition in bankruptcy has been filed, that the court should take possession of the same, pending the adjudication of title, it is within the jurisdiction of the court to order the marshal or a custodian to take possession of such property, and wherever, as in this case, the petition duly verified averred that the alleged bankrupt had transferred his property for the purpose of hindering, delaying, and defrauding creditors, and set forth facts tending to show that the transfer was null and void under the bankrupt act, and that the party in possession was financially irresponsible, and that there was danger that goods alleged to belong to the bankrupt would be lost to his estate without the interposition of the court, such court had and has the power, and it was its duty, to lay its hand upon the property and hold the same until the claims thereto or rights therein could be determined; that the object of the bankrupt law, which is to have the property of the bankrupt equally distributed among his creditors, would be entirely defeated, if in such a case the court was compelled to wait for the appointment of a trustee to bring a suit to recover such property, for by the time such suit could be determined the property in the hands of an irresponsible person might have been entirely dissipated. The power to make such seizure should not be lightly exercised or abused so as needlessly to oppress or injure those who claim title, and in all cases creditors who pray for such order of seizure should be required to give bond to indemnify the party injured, in the event that it should be determined thereafter that the party in whose possession the goods are is lawfully the owner thereof. Such bond was not required by the referee in this case, but a short date was fixed in which he could propound his claim to the property, and doubtless the referee would have directed the surrender of the same to Sanders if he had given bond, as it appears by the proceedings he at one time contemplated doing. The testimony at the hearings tends strongly to show that the conveyance of the stock of goods to Sanders was null and void under the bankrupt act. It

leaves no room for a doubt that the transfer was made by Knopf for the purpose of hindering, delaying, and defrauding his creditors; and assuming, as the court does upon this hearing, that Sanders actually paid the cash which he claims to have paid, the result to the petitioning creditors is the same as if he had not paid anything at all, for Knopf has not made any payments at all upon their claims. Being totally insolvent, these creditors, who sold to Knopf the very goods in question, will receive nothing. It is true that Knopf claims to have paid a debt of $1,500 to Loadholt, and to have made other small payments to other local creditors, all of which were unlawful preferences under the bankrupt act. It appears from Sanders' own testimony that he made no inquiry whatever as to Knopf's financial condition. An inquiry properly directed would have disclosed the fact that he was largely indebted. The transaction by which a retail merchant sells out his entire stock of merchandise is an unusual one, well calculated to put parties upon inquiry. But upon this petition for review I am not called upon to decide finally the question of Sanders' claim. It may be that his attorneys, relying upon the grounds made in their petition that the referee had no jurisdiction in the premises, may have omitted to present their case on the merits. I have examined carefully the cases cited in support of their view. It would unduly prolong this opinion if I should undertake to point out wherein they fail to do so, nor am I convinced by the very able argument of counsel that it was the duty of the trustee when appointed to bring a suit to recover the goods in question. This trustee it appears was not appointed until January 8th. If the court had waited until the determination of such a suit, the chances are that there would have been no property left. As it is, the property must be now held to be lawfully in the custody of this court, and is held by it in trust for those to whom it rightfully belongs. The administration and distribution of property of bankrupts is a proceeding in equity. Its procedure may be so moulded as to do justice to all concerned. Leave will therefore be given to Sanders to make such motion as he may be advised and as may seem to be necessary for the establishment of his claim to the goods. If, at the expiration of 15 days from the date of the filing of this opinion, no such motion is made, the referee will direct the trustee to sell the same in the ordinary course of administration of the bankrupt's estate.

The petition for review of the finding of the referee, and to set aside the same, is therefore denied, and his action in directing the seizure of the property is affirmed.