## In re KNOPF.

### Ex parte SANDERS.

(District Court, D. South Carolina. June 12, 1906.)

BANKRUPTCY—FRAUDULENT SALE OF GOODS BY BANKRUPT—RECOVERY BY TRUSTEE.

> A purchaser of the entire stock of a retail merchant is put upon inquiry as to the seller's solvency and motive in selling and will not be protected as a bona fide purchaser as against the creditors of the seller in bankruptcy where he made no inquiry of the seller, who in fact was insolvent and sold for the purpose of hindering, delaying and defrauding creditors and where the sale was made hurriedly without inventory and for a price considerably less than the actual value of the goods, even though he had no knowledge of such fraudulent purpose and paid for the goods.

> [Ed. Note.—For cases in point, see vol. 6, Cent. Dig. Bankruptcy, § 264.]

In Bankruptcy. Ex parte C. H. Sanders.

Jacob Gazan and J. A. Willis, for creditors.

Bates & Simms, for Sanders.

Davis & Best, for bankrupt.

BRAWLEY, District Judge. The opinion filed March 3, 1906 (144 Fed. 245) upon petition for review of the finding of the referee and for vacating the order of said referee for the taking possession of the stock of merchandise of the bankrupt alleged to have been illegally transferred to C. H. Sanders, states the facts which in the opinion of the court sustain the action of the referee. Leave was then given to C. H. Sanders to set up by an appropriate proceeding his claim of title to said stock of merchandise, and his petition was referred to the referee, who has taken testimony offered by Sanders in support of his claim, and the case is now before me upon a report of the testimony so taken, and argument has been heard thereon.

There is nothing in this testimony that has shaken the conclusions of the court heretofore reached that the purpose of Knopf in the disposal of his stock of merchandise at the time and in the manner stated was to hinder, delay and defraud his creditors. All the testimony tends to confirm the correctness of that conclusion. At the time of the transfer to Sanders, September 30, 1905, Knopf was indebted to his creditors for merchandise bought for the fall trade in the sum of $6,000 or $7,000, and some of the notes were then due and the creditors were beginning to press him for payment. The money paid by Sanders for the stock of merchandise was $3,000. The goods were nearly all fresh stock, bought for the fall trade, and in addition to this stock which Sanders bought for 75 per cent. of its cost, all of the accounts due Knopf were transferred to him. No inventory of the stock was taken. The transaction was hurriedly made, the offer having been made on Thursday afternoon, and the transaction concluded Saturday morning. Of the money received by Knopf, $1,500 was paid to one Loadholz, a local creditor; about $700 to his brother, J. J. Knopf, and about the same amount is alleged to have been sent to another brother. The creditors

who sold the merchandise in the autumn of 1905 received nothing, and Knopf has no other assets from which they can expect to receive anything. The sale was clearly made for the purpose of hindering and delaying these creditors, and that purpose has been accomplished. On this point there is no room whatever for a doubt, nor is it disputed. The only question is whether Sanders is so far a bona fide purchaser that his title to the goods is to be protected. That he has by his conduct enabled Knopf to consummate his scheme of fraud, and that the creditors who sold the goods, the title to which is now disputed, will receive nothing if the transfer to Sanders is sustained, is not contested. The testimony presented by Sanders in support of his claim as a bona fide purchaser is that he was a farmer in the neighborhood of Fairfax, in a small way, living upon rented land, and that by his honesty, industry and economy he had saved about $1,500. The witnesses produced all testify to his good character, and leave no reason to doubt that he actually paid the money which he claims to have paid for this stock of goods, $1,500 of this amount being his own money, and $1,500 borrowed from another party for that purpose. Assuming then that the money was actually paid and that Sanders had no actual knowledge of or intentional participation in Knopf's fraudulent purpose with respect to his creditors, is he entitled to be protected as a bona fide purchaser? It is well settled that a conveyance made for a fraudulent purpose may be set aside, and that the fraud of the vendor from whom the vendee derives his title will vitiate it if the vendee has either actual or constructive notice of the fraud, and constructive notice is such a knowledge of facts as should excite the suspicions of a man of ordinary prudence, and such as ought to have put him upon inquiry as to the reasons and motives of the vendor, which inquiry if followed with ordinary diligence would have led to the discovery of the fraudulent intent.

The case of Walbrun v. Babbitt, 16 Wall. 577, 21 L. Ed. 489, cited in the former opinion, and the other cases there cited, establish the principle that a transfer by a retail merchant of his entire business is not a sale in the usual course of trade, that it is prima facie fraudulent, and imposes upon the purchaser the active duty of inquiring into the vendor's financial situation. In Walbrun v. Babbitt, the court considered a transaction very similar to the one under review. In that case Mendleson, a retail merchant in a small town, sold his entire stock of goods to one Somerfield at 25 per cent. below cost, and Somerfield sold the goods to Ritter. There is no question that the money was actually paid. The court says:

"The usual and ordinary course of Mendelson's business was to sell at retail a miscellaneous stock of goods common to country stores in a small town in the interior of the state of Missouri. It was to conduct a business of this character that the goods were sold to him, and as long as he pursued the course of a retailer his creditors could not reach the property disposed of by him, even if his purpose at the time was to defraud them, but it is wholly a different thing when he sells his entire stock to one or more persons. It is an unusual occurrence, out of the ordinary mode of transacting such a business, is prima facie evidence of fraud, and throws the burden of proof on the purchaser to sustain the validity of his purchase."

The unusual character of the transaction raises a presumption of fraud. Knopf being insolvent, the law required an equal distribution of his as-

sets among his creditors. By reason of this transaction he was enabled to evade this obligation, and with the money received he has been enabled to make a fraudulent preference of one creditor, and to pay over to his two brothers the balance of the purchase money, so that the creditors who sold the goods received nothing. Sanders, who paid the money, has enabled him to consummate this fraud, and assuming his innocence of any intentional participation in the fraud, it is a familiar principle that where one of two innocent parties must suffer, the loss should fall upon that one by whose action the injury was inflicted.

The testimony shows that Sanders was desirous of embarking in the mercantile business, and for that purpose he made a contract with one Harter for the purchase of his stock; that he was to give the cost price of said stock, and a careful inventory was made of it. In the purchase of Knopf's stock he was to pay only 75 per cent. of the cost, and while mere inadequacy of price is not always a sufficient reason for vitiating a sale, it is sometimes considered a badge of fraud. He evidently thought that he was making what he called a "good deal" in purchasing the stock at 75 per cent. of its cost. He was so desirous of consummating it that he did not take time to make an inventory. The testimony is that Knopf told him that his business was not good; that one of his clerks in another store, to wit, his brother J. J., "was not doing exactly right"; that several notes were due, and that he expected to leave Fairfax. There is no testimony to show that Knopf told Sanders how much he owed, and Sanders admitted that he did not inquire. Sanders testifies that he did inquire of one Terry as to whether Knopf owed much money and that Terry told him that he did not know. He also says that he inquired of McClendon, who had been Knopf's clerk, but McClendon said he did not know how much Knopf owed. He also says that he asked Loadholz; Loadholz told him that he did not know anything of his debts. The only person of whom Sanders made any inquiry as to Isaac Knopf's financial condition who was in a position to know anything about it, was his brother, J. J. Knopf, who told him that Isaac was doing well, that he had made money; but Sanders had already been informed by Isaac himself that his business was not good, and had been informed of his suspicions of the dishonesty of J. J. Knopf. Sanders testifies that he did not believe these suspicions were well founded, and he took J. J. Knopf in his employment. He says that he did not examine the books of the concern because he was no bookkeeper and could not have learned anything from them; but he could have employed some one competent to examine the books for him, and such an inquiry would probably have disclosed the fact that the goods bought for the fall trade had not been paid for. I am constrained to hold, therefore, upon the authority of the case already cited, that the transaction being prima facie fraudulent, Sanders has not shown that he made proper inquiry to ascertain Knopf's pecuniary condition; that, in the words of the opinion already cited, he "knew or ought to have known that a retail dealer in selling out his entire stock was presumptively guilty of intending to defraud his creditors"; that he took the hazard of Knopf's insolvency and of the invalidity of his title. It is therefore adjudged and decreed that the petition of Sanders that the stock of goods be restored to him be dismissed, and the trustee is di-

rected to dispose of the same in the ordinary course of administration of the estate of bankrupts and to distribute the proceeds among the creditors of Knopf.

A question was made upon the last hearing as to Sanders' claim to have returned to him so much of the money proved to have been paid out of the purchase money on the note to Loadholz. It may be that he has some claim of subrogation in the event that the trustee recovers from Loadholz, but that question is not now before me.