WALBRUN v. BABBITT.

1. When on the undisputed parts of a case a verdict is clearly right, so that if a new *venire* were awarded the same verdict would have to be given, a court will not reverse because on some disputed points a charge may have been technically inaccurate.
2. A sale by a retail country merchant then insolvent of his entire stock, suddenly, is a sale " not made in the usual and ordinary course " of his business; and, therefore, *primâ facie* evidence of fraud, within the 35th section of the bankrupt law.

---

3. The presumption of fraud arising from the unusual nature of such a sale can be overcome only by proof on the part of the buyer that he pursued in good faith all reasonable means to find out the pecuniary condition of the vendor.

4. One purchasing in such a case from a vendee who he knows has used no such means, but on the contrary has bought under other suspicious circumstances, takes with full knowledge of the infirmity of the title. And as against either or both purchasers the assignee in bankruptcy may set the sale aside if made within six months before a decree in bankruptcy, even though a fair money consideration have been paid by each.

ERROR to the Circuit Court for the District of Missouri.

Babbitt, assignee in bankruptcy of Marks Mendelson, brought trover against Walbrun & Co. in the court below, to recover the value of a stock of merchandise sold by the bankrupt to one Summerfield, and by the latter to the said defendants. The ground of the action was that the several transfers were frauds on the bankrupt law under the 35th section thereof—a section in these words:*

"If any person, being insolvent or in contemplation of insolvency or bankruptcy, within six months before the filing of the petition by or against him, makes any payment, *sale*, assignment, transfer, conveyance, or other disposition of any part of his property to any person who then has reasonable cause to believe him to be insolvent, or to be acting in contemplation of insolvency, and that such payment, *sale*, assignment, transfer, or other conveyance, is made with a view to prevent his property from coming to his assignee in bankruptcy, or to prevent the same from being distributed under this act, or to defeat the object of, or in any way impair, hinder, impede, or delay the operation and effect of, or to evade any of the provisions of this act, the sale, assignment, transfer, or conveyance shall be void, and the assignee may recover the property or the value thereof as assets of the bankrupt; and if such *sale*, assignment, transfer, or conveyance *is not made in the usual and ordinary course of business of the debtor, the fact shall be* primâ facie *evidence of fraud.*"

The facts of the case which were undisputed, were thus: In November, 1868, Mendelson, doing business in Kings-

---

* 14 Stat. at Large, 534.

.ville, a small town in the interior of Missouri, as a retail country merchant, wrote to one Summerfield, who was his brother-in-law, living in St. Louis and engaged there in the furniture business, to bring some money and come and buy him out. Summerfield at once went to Kingsville, and took, in currency, money enough for the purpose. On his arrival there Mendelson told him he was desirous of selling his stock, because he could not succeed in the business in which he was engaged, and wished to deal in furniture and hardware. An account of stock was taken, and Summerfield paid Mendelson for it after deducting 25 per cent. off the cost price. Soon after this purchase Summerfield, leaving. Mendelson in possession of the store, went to Chillicothe, Missouri, and told Walbrun & Co., a firm there with which he had some acquaintance, of his purchase of the stock of goods at 25 per cent. below cost, because the owner wanted to go into the furniture business, and that, as he only desired to make 5 per cent., he would resell to them at 20 per cent. below cost. They agreed to take the goods at his offer, as they needed some of the articles to replenish their stock, if they came up to the account that was given of them. Accordingly, one Ritter, a member of the firm, went back to Kingsville with Summerfield. They found Mendelson still in charge of the store. Some of the goods were boxed up and some on the shelves. In making his purchase, Ritter made no inquiry of the pecuniary condition of either Mendelson or Summerfield. Both parties lodged at Mendelson's house. The morning after arriving they commenced examining the goods at the store, and found some of them in bad condition, of which Ritter complained. After measuring several pieces, to see if the stock conformed to the inventory, Summerfield excused himself from further service on the ground that he had to return to St. Louis, as he had just learned of the sickness of his wife, and told Ritter to take the goods home with him, and if the inventory was defective he would make it right. Ritter replied that he thought that if they would work hard they could soon get through, but finally yielded to Summerfield's persua-

sions, and, with the assistance of Mendelson, boxed the goods up and shipped them to Chillicothe. Ritter paid the full inventory price at the agreed rate, and both parties left Kingsville that night for their respective homes. Mendelson's debts at the time of this sale were about $9000. This stock of goods was all the property worth naming that he had. The price given by Summerfield for it was $5373.

On the 24th of December, 1868, on petition of his creditors, Mendelson was adjudicated a bankrupt. The money received by him from Summerfield for the goods did not reach his creditors, as, according to his own statement, he lost it.

There were other facts and circumstances connected with the transactions which invited inquiry, but, as they were represented differently in the sworn testimony of the different witnesses, they are not given as any part of the case. All the witnesses agreed in the case as stated above, and as this court considered, there was no necessity, for the purposes of this suit, of going beyond it.

The court below gave several instructions bearing, some of them, on these disputed parts of the case. These instructions were assigned for error, though in several points not unfavorable to the defendant. But on the whole case, embracing the undisputed parts of the suit (the case as above given), the court directed the jury to find for the plaintiff. Verdict and judgment went accordingly. The defendants now brought the case here.

*Mr. T. J. Durant, for the plaintiff in error; Mr. Nathaniel Myers, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

In the view we take of this case it is not necessary to notice the assignments of error upon the instructions to the jury by the court below. In some respects they may be technically inaccurate, and in others they were far too favorable to the defendants. But, in any event, they did not materially affect the merits of the action, and, as there were no

disputed facts bearing on the real matter in controversy, the court could have properly told the jury to find, as they did, for the plaintiffs.* Indeed, the verdict was so obviously right that the court would not set aside the judgment when the record shows that no other result could be obtained on a new trial.

That Mendelson intended to defraud his creditors in the course which he pursued is too plain for controversy; but the inquiry is, has he succeeded in diverting his property from the payment of his debts to the injury of his creditors?

The 35th section of the bankrupt law condemns fraudulent sales equally with fraudulent preferences, and declares that if such sales are not made in the usual and ordinary course of the business of the debtor that fact shall be *primâ facie* evidence of fraud. The usual and ordinary course of Mendelson's business was to sell at retail a miscellaneous stock of goods common to country stores in a small town in the interior of the State of Missouri. It was to conduct a business of this character that the goods were sold to him, and, as long as he pursued the course of a retailer, his creditors could not reach the property disposed of by him, even if his purpose at the time were to defraud them.

But it is wholly a different thing when he sells his entire stock to one or more persons. This is an unusual occurrence, out of the ordinary mode of transacting such a business, is *primâ facie* evidence of fraud, and throws the burden of proof on the purchaser to sustain the validity of his purchase.†

Summerfield seeks to overthrow the legal presumption that Mendelson intended to commit a fraud on his creditors by showing that he paid full value for the goods in ignorance of the condition of Mendelson's affairs. But the law will not let him escape in this way. The question raised by the

---

* Bevans *v.* The United States, 13 Wallace, 56.

† Scammon, Assignee, *v.* Cole, 5 National Bankruptcy Register, 257; Graham *v.* Stark et al., 3 Id. 95; Kingsbury et al. *v.* Hale, Ib. 84, Driggs *v.* Moore, Ib. 149; Tuttle *v.* Truax, 1 Id. 169.

statute is not his actual belief, but what he had reasonable cause to believe. In purchasing in the way and under the circumstances he did, the law told him that a fraud of some kind was intended on the part of the seller, and he was put on inquiry to ascertain the true condition of Mendelson's business. This he did not do, nor did he make any attempt in that direction. Indeed, he contented himself with limiting his inquiries to the object Mendelson had in selling out, and to his future purposes. Something more was required than this information to repel the presumption of fraud which the law raised in the mere fact of a retail merchant selling out his entire stock of goods. If this sort of information could sustain the sale, the provision of the bankrupt law we are considering would be no protection to creditors, for any one in Mendelson's situation, and with the purpose he had in view, would be likely to give the party with whom he was dealing a plausible reason for his conduct.

The presumption of fraud arising from the unusual nature of the sale in this case can only be overcome by proof on the part of the buyer that he took the proper steps to find out the pecuniary condition of the seller. All reasonable means, pursued in good faith, must be used for this purpose. If Summerfield had employed any means at all directed to this end he would have discovered the actual insolvency of Mendelson.

In choosing to remain ignorant of what the necessities of his case required him to know, he took the risk of the impeachment of the transaction by the assignee in bankruptcy, in case Mendelson should, within the time limited in the statute, be declared a bankrupt.

The defendants are in no better condition than Summerfield would be if he had not transferred the stock to them, because they took his title with full knowledge of its infirmity, and must blame their own folly for the result. Ritter, the active agent of the firm in the transaction, was fully informed by Summerfield of the circumstances attending his purchase, and this information was confirmed on his arrival at Kingsville. He there found Mendelson in charge of the

store, with some of the goods boxed up and some on the shelves, sure indications that the sale was recent and that there had been no actual change of possession.   These things, in connection with the residence of Summerfield in St. Louis, and his occupation there, ought to have excited the fears of a reasonable man that the sale by Mendelson was not for an honest purpose, and prompted him to make inquiry upon the subject.   Ritter, instead of doing this, treated the transaction as one of ordinary occurrence and as not imposing on him the duty of ascertaining the pecuniary status of either the vendor or vendee.   Without learning anything, or seeking to learn anything, beyond the facts that the goods suited him and Mendelson wanted to change his business, he completed the purchase and immediately transferred the stock to the store of the defendants in Chillicothe.   If this sale can be upheld, the law which declared the title of Summerfield *primâ facie* fraudulent could be easily rendered of no benefit, for all that would be necessary for a person buying property out of the ordinary course of business of the seller, to place it out of the reach of creditors, would be, as soon as he had consummated his purchase, to sell to another, who would acquire a good title, no matter how presumptively invalid the title of his vendor might be.   It needs no argument to prove that if the law against fraudulent sales could be evaded in this way, it would furnish no sort of protection to creditors.   Ritter, when he purchased, knew the nature of Summerfield's title, because he knew, or ought to have known, that a retail dealer like Mendelson, in selling out his entire stock, was presumptively guilty of intending to defraud his creditors, if it should turn out that he had any.   Of this the bankrupt law gave him distinct notice, and as he chose, like Summerfield, to remain ignorant of Mendelson's affairs, he took the hazard of Summerfield's inability to prove the fairness of his title.   It follows that if the sale to Summerfield cannot be supported, neither can the sale by him to the defendants.

It is unnecessary to notice the exceptions taken to the admission or rejection of testimony, because our decision is

based on the evidence which was received without objection, and about which there is no controversy.

JUDGMENT AFFIRMED.