NORTON, Assignee, *v.* BILLINGS and others.

*(Circuit Court, N. D. Illinois.* November 27, 1880.)

1. VENDEE—FRAUD—PRIMA FACIE EVIDENCE.—A sale by a retail merchant of his whole stock, within the period limited by the bankrupt act, is *prima facie* evidence of fraud against the vendee.

2. SAME—CONSIDERATION—PRESUMPTION.—Such presumption cannot be overthrown by proof that the full value of the property was paid in ignorance of the insolvency of the vendor.
    *Walbrun v. Babbitt,* 16 Wall.,577.

3. SAME—FRAUD—PRESUMPTION.—Such presumption can only be overcome by proof on the part of the vendee that he took the proper steps to find out the pecuniary condition of the vendor.
    *Walbrun v. Babbitt, supra.*

4. SAME—EVIDENCE.—It is competent for the vendee to show, however, that the insolvent vendor intended in good faith to use the means acquired from the sale in the payment of his debts, *pro rata,* among his creditors.

In Bankruptcy.

*J. W. Ela,* for plaintiff.

*Sidney Smith,* for defendants.

DRUMMOND, C. J.   Nowlin & McElwain had been for several years engaged in business as jewelers in the city of Chicago, prior to the spring of 1870, when they became embarrassed, and found it necessary to demand an extension from their creditors.   McElwain accordingly went to New York in May of that year, where the firm was indebted to different merchants, to the amount of more than $20,000.   While there he made a statement of the condition of the affairs of the firm

in Chicago to different creditors, from which statement it appeared that the firm had assets to the amount of about $39,000, and owed about $23,000. In the statement was included the amount of indebtedness in Chicago, which was set down at about $2,000. Upon the representations thus made to the New York creditors an extension was granted, not for the whole time demanded, but so as to relieve the parties from the necessity of meeting their paper, then about to fall due.

McElwain returned to Chicago, and they continued their business until the following September, when a general assignment or sale was made by the firm of all their stock to Henry F. Billings, the principal defendant in this case. In October of the same year two of the New York creditors came to Chicago to inquire into the condition of the firm, and the result was a petition in bankruptcy against the firm, and a decree of the court finding that they were bankrupts.

The evidence shows an inventory was taken of the stock of the firm in May, 1870, amounting to $30,000, and that there was an inventory taken with a view of the sale to Billings, which amounted to about $17,000. Considerable negotiations took place between Billings and McElwain before the trade was consummated and the assignment made. McElwain proposed that Billings should buy out Nowlin, the other partner, which proposition was declined by Billings. The offer made by Billings, which was finally accepted, was that the goods should be invoiced,—recently purchased goods at their cost, and goods which had been on hand for some time at current prices for goods of like qualities, and the fixtures at cost,—and from the amount thus ascertained a discount of 25 per cent. should be made. The price thus obtained was $13,040.58, upon which basis the contract was made, and the property turned over to Billings, who immediately had a new sign made in his own name and placed over the door, and Nowlin & McElwain were retained for a few months to assist in carrying on the business. One of the reasons given by McElwain for the sale was that the time during which they were to be partners had expired, and that Billings was him-

self at that time out of employment, and desired some occupation, although he had no knowledge of the business in which the firm was engaged. A very small sum was paid in cash by Billings at the time, and notes were given for the balance due, some of which were negotiated by the firm; and afterwards a new arrangement took place, by which the old notes were taken up, and new ones given, because of the amount paid for the lease of the store, which Billings claimed was too large. From this sale the firm realized about $10,000, none of which was paid to the New York creditors.

The evidence shows that the statement made by McElwain to his creditors in New York, of the amount of the Chicago indebtedness, was not correct; that it largely exceeded the amount as stated by him, and it would seem that the proceeds of this sale were used in the payment of the Chicago indebtedness, and for the living expenses of the members of the firm. It should also be stated that there is evidence tending to show that McElwain, between the time when he obtained the extension from the New York creditors and the sale made to Billings, had taken from the stock some watches and other articles of jewelry which are not very satisfactorily accounted for; but there seems no reason to doubt that Billings obtained the amount of the goods inventoried to him at the time of the assignment. Neither can there be any doubt, under the evidence, that the price which he agreed to pay was the full value of the goods. Billings paid the whole of the purchase money, taking up all the notes which were given by him. He, however, did not remain long in the business, but disposed of the whole stock in the following spring. McElwain seems to have been the man principally concerned in all the transactions which are here mentioned, Nowlin remaining passive, or merely assenting, as the facts were communicated to him, to what had been done by McElwain. At the time the proposition for an extension was made to the New York creditors, and at the time the assignment was made to Billings, the firm was insolvent. Whatever may have been their expectations in May, there can be no doubt that in September, when the transfer was made to Billings, they knew of

their insolvency, and made it for the purpose of giving a preference to some of their creditors, and so, as to them, it was fraudulent under the bankrupt law. The true course for them to pursue at the time was either to go into bankruptcy voluntarily, or to make an assignment for the benefit of all their creditors. The testimony of Nowlin is full of admissions of his knowledge of their insolvency on the first of September, 1870. At the time Billings made this purchase he seems to have been a man of some means. He states that he had no knowledge of the insolvency of the firm, nor of the extension that was given, and believed that their credit was very good; and the testimony of both Nowlin and McElwain does not show that Billings had knowledge of their condition at the time of the sale.

The question in controversy must, therefore, depend almost exclusively upon the true construction of the bankrupt law, as applied to the facts of the case as heretofore stated. There is no difficulty upon any other point than this: Had Billings reasonable cause to believe or had he knowledge of the intention with which the sale was made to him? As has been stated, there can be no doubt of the intention of the vendors. All the acts preceding and subsequent to the sale show that intention to have been in violation of the bankrupt law.

This was an assignment of all the debtor's property. Section 5130, Rev. St. U. S., re-enacting a clause contained in section 35 of the original bankrupt law, declares that if an assignment is made of a debtor's property, not in the usual and ordinary course of the business of the debtor, it shall be *prima facie* evidence of fraud. This firm was doing a retail business in Chicago at the time, and that which ordinarily belongs to jewelers. This, having been an assignment of the whole stock of the firm, must be considered not made in the usual and ordinary course of business, and, therefore, as well *prima facie* evidence of fraud against the vendee as the vendors. In other words, that fact of itself evidenced fraud to the vendee as well as the vendors. If this is correct, then the question which was discussed by the counsel as to the effect of the amendment of 1874 on the bankrupt law, requiring

knowledge on the part of the vendee, instead of reasonable cause of belief of the fraudulent intent, cannot arise, because if the facts conveyed to Billings the knowledge that it was a fraudulent act, then the only way to escape the consequences of that knowledge would be to avoid the language of the statute. In other words, to rebut the *prima facie* case made; and the question is whether that has been done in this case.

The case of *Walbrun* v. *Babbitt*, 16 Wall. 577, seems to imply that a sale, such as was made in this case, is within the meaning of the statute; and the opinion of the court declares that the purchaser cannot overthrow the legal presumption which arises from the fact, by showing that the full value of the property was paid in ignorance of the insolvency of the vendors. The court declares that the presumption of fraud arising from the unusual nature of such a sale can only be overcome by proof on the part of the buyer that he took the proper steps to find out the pecuniary condition of the seller. "All reasonable means," the court says, "pursued in good faith, must be used for this purpose." That the transfer of the whole of the debtor's property is not in the usual and ordinary course of business, seems to be sustained by numerous authorities, most of which are collected by Bump in the notes to section 5128 of the bankrupt law.

One circumstance ought not to be overlooked in considering the effect of this assignment upon Billings, and that is it was hardly supposable that a firm engaged in the business of this firm would be entirely free from debt. Undoubtedly it would have been competent for the vendee to show, if such was the fact, even if he had knowledge of the insolvency of the firm, that they intended in good faith to use the means acquired from the sale in the payment of their debts, *pro rata*, among their creditors, because the fact that the vendor is insolvent, and that is known to the vendee, does not of itself render a sale invalid under the bankrupt law. It must appear in addition that the assignment or sale was made with a view to prevent the property from being distributed under the bankrupt law, or to defeat or impair its provisions, or that the assignment was made in fraud of the law.

The *prima facie* case made against the vendee here cannot be said to have been met by any evidence which, fairly considered, rebuts the presumption made by the law. It may be said that it is a hard case against Billings, because he has paid the full value of the goods which he obtained; but the supreme court has declared, as already stated, that he cannot escape by showing that he paid the full value of the property in ignorance of the insolvency of the debtors.

The bill was filed in this case in the district court by the assignee of the bankrupts, in the early part of 1871, to set aside the sale as fraudulent; and the prayer of the bill is that the sale to Billings be declared void by the order of the court, and that he be decreed to deliver the goods and fixtures to the assignee, and to account to him for the value of such goods and fixtures as he may have disposed of since the sale made to him. This is followed by the prayer for general relief. Answers were made by Billings and the bankrupts denying the allegations of fraud charged in the bill, on which issue was taken, and proofs; and the original records of the case having been destroyed by the fire of 1871, were restored, and the case heard by the district court. That court, impressed, perhaps, by the fact that Billings had paid a full consideration for the goods, and the denial by him of all knowledge, at the time of the sale, of the insolvency of the bankrupts, dismissed the bill; but I feel constrained, notwithstanding the apparent hardship of the case as to Billings, to dissent from the opinion of the district court. It seems to me that the sale cannot be sustained consistently with the express declarations of the bankrupt law, and the opinion of the supreme court as to a sale of this character. I think the proof is satisfactory that it was a sale made not in the usual and ordinary course of business of the debtors, and, therefore, I shall reverse the decree of the district court, and hold that the plaintiff is entitled to a decree in his favor as assignee of the estate.