BENTLEY v. YOUNG et al

(District Court, S. D. New York. January 6, 1914.)

1. BANKRUPTCY (§ 303*)—SALES—FRAUD AS TO CREDITORS—BONA FIDE PURCHASERS.

Where a bankrupt has made a fraudulent sale of his stock of goods, not in the ordinary course of business, the burden is on the purchaser, in order to sustain the same, under Bankruptcy Act July 1, 1898, c. 541, § 67e, 30 Stat. 564 (U. S. Comp. St. 1901, p. 3449), making void all sales in fraud of creditors except as against bona fide purchasers, to show that he is in fact a purchaser in good faith.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

2. BANKRUPTCY (§ 182*)—FRAUDULENT SALES—BONA FIDE PURCHASER.

Where a bankrupt has sold his stock of goods in fraud of creditors, mere personal good faith on the part of the purchaser is not enough to establish that he is a bona fide purchaser for value.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 255–258; Dec. Dig. § 182.*]

3. BANKRUPTCY (§ 182*)—FRAUDULENT SALES—BONA FIDE PURCHASER.

An auctioneer, engaged in purchasing bankrupt stocks, during an illness furnished funds to his son who, ascertaining that the bankrupt, a small retail shoe dealer, desired to sell his stock and fixtures, worth about $2,500, went to his store and purchased the same for $1,200, taking a receipt in which the bankrupt stated that the property was his own and was sold free and clear of all claims and mortgages. The son testified that he examined some of the bankrupt's paid bills, and, finding them receipted, supposed he could take the word of the bankrupt for the rest that he was not indebted to creditors. The next morning the son hired a van, appeared at the bankrupt's store at 7:30 a. m., and in an hour's time emptied the store and took the stock to his father's auction rooms, where it was sold. *Held*, that such facts were sufficient to put the son on inquiry whether the bankrupt was making a sale in fraud of creditors, and

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that his failure to make further inquiry, which he could easily have done, was sufficient to show that he was not a bona fide purchaser.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 255–258; Dec. Dig. § 182.*]

4. PRINCIPAL AND AGENT (§ 171*)—ACTS OF AGENT—LIABILITY OF PRINCIPAL.
Where a father, who was an auctioneer, advanced money to his son with which the latter purchased the stock in trade of a bankrupt with notice that it was being sold to him in fraud of creditors, and on the stock being removed to the father's auction rooms, he took charge of it, acted as the principal, and treated with the representatives of creditors who subsequently appeared and claimed that the goods had been fraudulently sold, such acts were a ratification of the son's acts, and hence the father, when sued for the value of the stock, could not successfully claim that the son made the purchase on his own account.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 644–655; Dec. Dig. § 171.*]

5. EVIDENCE (§ 571*)—OPINIONS OF EXPERTS—VALUE—EFFECT.
Where a purchaser of a bankrupt's stock, at a sale in fraud of creditors, refused to permit the representatives of creditors to examine the goods after they had been removed to the purchaser's auction rooms, so that the actual value of the goods could be ascertained, he was not entitled to complain that evidence of estimates by experts was insufficient to show the value of such goods.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1580; Dec. Dig. § 571.*]

6. BANKRUPTCY (§ 303*)—BANKRUPT STOCK—FRAUDULENT SALE—VALUE.
In an action against a fraudulent purchaser of the stock of a bankrupt, evidence *held* to warrant a finding that the value of the goods purchased was $2,500.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

In Equity. Bill by George F. Bentley, as trustee in bankruptcy of Israel Kruger, against John Young and another. Judgment for plaintiff.

This is a bill in equity to set aside a sale of the bankrupt's stock of goods made to the defendant Henry Young, and to recover their value. The defendant John Young is joined as the principal in the transaction. The bankrupt, Israel Kruger, had a small retail shoe shop at 2073 Third avenue in the borough of Manhattan, and on Monday, October 30th, went to the auction rooms occupied by the defendant John Young, and there found his son Henry, to whom he offered to sell the whole of his stock and fixtures. Henry went with him to the shop, looked over the stock, made an inventory, which he put down in a notebook, and offered to buy him out for $1,200. Kruger after higgling agreed, and Young put a custodian in charge and continued the business that afternoon and evening. Very early next morning, not later than 7:30, Young hired a van with three men, in about an hour's time emptied the shop, and took the goods down to his father's auction rooms. It is not certain just what happened to them then. Henry Young says that he sold the greater part on Tuesday afternoon to two strangers for $1,000, and that none were delivered to buyers at an auction sale at which they were sold on Wednesday. That auction had certainly been advertised on Tuesday and Wednesday in the New York American, and Henry Young says it was likewise advertised on Sunday and Monday, but while the files were in court no suggestion was made to prove the earlier publications. Whether any goods were in fact delivered on Wednesday there is no means of knowing.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Young got no bill of sale or other evidence of his purchase, except a receipt signed by the bankrupt for $1,200 "for my entire stock of shoes, rubbers, fixtures in store No. 2073 Third avenue. The same is my own personal property and sold to me free and clear of all claims and mortgages." On Wednesday Taylor, representing an association of wholesale shoe dealers in New York, filed a petition in bankruptcy against him and got a receiver and an injunction and with a copy of the injunction went to the auction rooms of John Young at about noon of that day, found him selling the goods, and had an interview with him, demanding that he stop the sale in compliance with the injunction. Later in the day he came again with a number of salesmen, and John Young at that time allowed the outsides of the cartons to be examined, but refused to permit them to look inside. He says that he inquired of Kruger whether he had any indebtedness, and was told that he had not, except $200, which he owed to a cousin, and which he paid while Young was there. Upon the trial he swore that Kruger had shown him receipted bills of several jobbing houses, mentioning three or four, but on his examination two days after the failure, he could not remember the names of any one of the persons whose receipted bills he had seen. The memorandum or inventory in his notebook showed 1,761 pairs of boots, shoes, rubbers and slippers, and a total value of the stock of $1,429.85, which is the amount that he thought he could get for the goods, and was the basis of bargain. He says that the bankrupt first asked $1,500 and later took $1,200, that being 60 per cent. of the value of $2,000 taken at cost, as Young estimated it. The bankrupt's excuse for selling out was that he wished to set up in the furniture business on Second or Third avenue. Young is a speculator in secondhand stocks of merchandise and had often bought shoes.

The money with which this stock was bought came from John Young. He swore that three weeks previously he was taken to the hospital for a severe operation, and that he at that time gave some blank checks to Henry with the understanding that he might fill them in for such sums as were necessary, and use them on his own account for his own business transactions. He further swore that, although up to three or four years before the time of these occurrences he had been engaged in the business of buying and selling stocks of goods, sometimes of shoes, he had abandoned that business and confined himself strictly to that of auctioneer. He had, however, he said, from time to time advanced to his son money for the sake of buying stocks of merchandise on his own account. He swore that he knew nothing whatever of these transactions until he came to the auction rooms on Wednesday, when he learned that there was a large stock of shoes to be sold, including more than Kruger's; that he began selling these goods, but stopped after Taylor showed him the injunction. Taylor says that when the injunction was shown, John Young said to him that he would go ahead and sell the stock, but make no deliveries and that some of the goods might be Kruger's. Taylor then told him that he could easily demonstrate whose goods they were, to which John Young objected. In the afternoon, too, Taylor says that Young admitted to him that part of the stock, or all of the stock to be sold, had been purchased from Kruger, and that when the salesmen came up to identify the goods, he said that he was willing to let them go through the stock and look at it. Later, however, he came out and ordered everybody to take their hands off the goods. Thereupon Taylor instructed the salesmen to look inside the cartons, which would have enabled them exactly to identify Kruger's stock, but John Young said he had instructions from his attorney not to let anybody touch the boxes, and he ordered them to go outside the counter. Before they left, however, he said that he did not want to have any trouble over the matter, and asked if there were not some way in which it could be fixed up. About five or six months later, Taylor says, Young came to see him and said, "I know I have not got this stock. The stock has been all disposed of. All I have got down in the cellar is a desk or a show case, and I want to get rid of that. I want to know if you will tell me if there is not some way to settle the matter." At that time Taylor says he offered him a couple of hundred dollars to settle. On the other hand, all the salesmen swore that they were allowed only to see the outside of the cartons from which they could tell the make and kind of shoe, but could not trace them to Kruger's stock.

William Lesser, of New York City, for trustee.

Albert H. Gleason, of New York City, for defendants.

HAND, District Judge (after stating the facts as above). I have not the least doubt that a decree should go in this case against Henry Young for the value of these goods. The only doubtful questions are whether John Young was a party to the transaction, and what was the value of the goods.

[1] That Henry Young was chargeable with the duty to investigate further before buying the goods seems to me pretty obvious. Following I'ruck v. Christy, 152 Fed. 612, 81 C. C. A. 602, I will not say that the rule in Walbrun v. Babbitt, 16 Wall. 577, 21 L. Ed. 489, applies to section 67e of the present act. Any language in Dokken v. Page, 147 Fed. 438, 77 C. C. A. 674, to that effect must be regarded as overruled. It will not do to say that as matter of law and under all circumstances a sale of goods out of due course is prima facie evidence of a sale in fraud of creditors. That was explicitly so provided in the thirty-fifth section of the old act; there is nothing of the sort in the present act. However, I think substantially the same result follows from the present form of 67e, for that section makes void all sales in fraud of creditors except as against bona fide purchasers. The defense of a bona fide purchase for value has always been an affirmative defense in the law, and there is no reason to adopt a different procedural rule in this case. Indeed I understood Mr. Gleason to assent to the proposition that a transfer by a bankrupt in fraud of creditors puts upon the transferee the burden of an affirmative defense of good faith.

[2] Now, of course, there is no room for argument that the sale was not in fraud of creditors, so far as Kruger was concerned, and therefore the case comes down only to this: Whether the defendants have established their defense of bona fides. I think it quite clear that Henry Young has failed to do this. It must be remembered that his personal good faith is not enough; the question is, not what he individually believed, but whether the circumstances would have put a reasonable man in his situation upon inquiry, and whether that inquiry would have led to sufficient knowledge of the facts to prevent the sale.

[3] In the first place, a sale by a retailer of his whole stock of goods, including his fixtures, so that his place is entirely cleaned out, is an unusual thing; it ought at once to suggest to a man who is in the business of speculating in stocks of goods, as Henry Young was, that the purpose might have been to abscond with the proceeds and leave his creditors. Furthermore the very form of the receipt suggests that Henry, not only ought to have been, but actually was, suspicious, for the words are: "The same is my own personal property and sold to me free and clear of all claims and mortgage."

That is the kind of language one uses to assure oneself. Indeed he says that he found it necessary to inquire whether there were any creditors, showing that he knew that there might be, and that if there were, the sale might be void. It is quite clear that he was put on inquiry. Did he make all reasonable inquiry? He says that he examined some of the paid bills, and, finding them receipted, supposed he

could take the word of the bankrupt for the rest. I doubt the truth of this explanation; it seems to me too suspicious that, upon the trial, two years after, he could give the names of a number of wholesalers whose bills Kruger had shown him, and yet, two or three days after the event, when examined before the commissioner, he failed to remember any of the names. That discrepancy corroborates an unpleasant impression which I got from his appearance, and leads me to the question whether he ever did see any such bills. But I think his duty hardly stopped there, even if he had seen the bills, which must have been at least one month old. The names of the sellers of these goods were upon the cartons, easily accessible; they all lived in the city of New York, or at least many did, and it was a very simple thing to call up one or more of them and learn whether Kruger was speaking truly. It is at least the more usual thing for such a small retailer to be always somewhat in debt; he generally gets all the credit he can. A single telephone call would have been sufficient to disclose the whole scheme. Furthermore, I believe the price at which he bought was wholly inadequate, as I shall show when I come to consider the amount of the decree; if inadequate, it was a strong additional proof of fraud, nearly conclusive. Again, the removal was most suspicious. There was no occasion for taking the goods out so early in the morning, except to conceal their whereabouts, and there was good reason to do it if that was the purpose, for the salesmen of these wholesalers constantly make their rounds in this city, and the best time to elude them was the early morning. I am, indeed, disposed to believe Mrs. O'Hearn when she says that the removal was well under way at a quarter to 7. I decidedly prefer her as a witness to Coulon, who puts the time later. Finally, the story of the sale of $1,000 worth of the goods on Tuesday to two anonymous persons, who came in to the auction rooms and bought and carried it off on that day, seems to me improbable.

In short, I have no doubt that the transaction was the common one between bankrupts and their abettors; that is to say, that the bankrupt, finding that he had come to the end of his rope, looked out for a facile purchaser who would ask no questions and give him something for his goods; that such a purchaser he found in Henry Young. A decree, under these circumstances, must be entered against Young for the value of the goods. It would, of course, be preposterous, under the circumstances, to require the estate to restore the consideration which Young must have known was likely to be carried off by the absconding bankrupt, just as happened.

[4] The next question is of the complicity of John Young. My conclusion is that, whether or not John was sick, as he says, he advanced the money to Henry to use for John himself, and not for Henry. It may well be that he knew nothing about this particular transaction until Wednesday, when he came back, and that he did not in advance authorize this kind of purchase. I think it absurd to suppose, however, that he did not at that time learn of the circumstances from Henry. My reason for thinking this is that when Taylor, whose testimony I accept absolutely, came to the auction rooms on Wednes-

day, he had all his dealings with John, who at once assumed responsibility and kept it throughout. It was John who first gave the permission for the salesmen to inspect the goods, and later refused to let them go further; it was John who afterwards attempted to settle matters; it was John who said that the goods would be sold, but would not be delivered, and it was John who called up the attorney to see how the order of the court should be treated. All this seems to me absolutely inconsistent with the idea that John was acting only as Henry's auctioneer. Had that been so, he would at once have called in Henry and said: "Here's a man who says you have no right to these goods; you will have to settle this matter with him. I have nothing to do with it. This is your bargain, and you must settle with him."

Every circumstance points to the inference that John used Henry to buy such stocks of goods for him, and so continue the business exactly as John had done it in the past with Klinger; perhaps he used him for this very kind of event. It was perfectly apparent that the father was much the superior in intelligence and the more masterful in disposition, and it seems improbable that he should simply have advanced to the son large sums of money for his own independent business in which the father had nothing to do but get his auctioneer's fees. Whatever that may have been in other cases, the father's own conduct when the matter was questioned should remove any doubt. I may say incidentally that the bearing of John Young upon the witness stand did not impress me with the value of his testimony. I think, therefore, that the judgment must go against him as well as Henry.

[5] The remaining question is of value. It is quite true that the testimony of the salesmen was not based upon the most accurate foundation. None of them had looked through all the cartons as they lay upon Kruger's shelves, and their estimates must be taken with some allowance, as they themselves realized. It is nevertheless true that three of them gave figures the lower limits of which they were absolutely ready to stand on; and it is also true that each had been in the habit of making such estimates in his business every day and turning them into his principal, and that the principal had been in the habit of acting upon those estimates in allowing credit to retailers. Under these circumstances, I think that the estimates are better than mere guesses, as Mr. Gleason would have me hold. It is quite true that perhaps there were no shoes in some of the cartons, but that objection does not lie in the mouth of the Youngs, who made it impossible for us now to find how many cartons were empty and how many were not. In hastily removing and disposing of this stock, they have effectually prevented any accurate finding upon its value; and, while in this suit I cannot penalize them for that, yet when there is a fair doubt, they who have destroyed the evidence must be content if it is resolved against them. The story about the sale on Tuesday to two strangers of the greater part of the shoes for $1,000 has every earmark of an invention to cover a disregard of the injunction.

[6] On the other hand, I am disposed to believe that the figures

of the number of shoes upon Henry Young's memorandum were correct, and that the total number of pairs was 1,761. That does not, however, much help to get a valuation, for I do not believe that the prices per pair which he set down in any sense actually represented the value of the stock. They were probably put down as a basis of trading with Kruger. Young himself says that Kruger first put the value of his stock at $1,500, and it was only after some higgling that he beat him down. Now a bankrupt, under these circumstances, does not ask the full value of his goods, for he knows he cannot get it. While I believe that memorandum stated the amount of the stock accurately, I refuse to consider it as the value of the stock. Taking the lowest limits of the three estimates of the salesmen, and having in mind that Henry Young himself concedes that the cost value of the stock was $2,000, I think I shall do as well as the circumstances permit if I direct a decree against both the defendants for $2,500, with interest from the 1st of November, 1911, and costs.

I do not think that the stock which defendants say is still in John Young's auction rooms need be taken back at its proportionate value. It may be sold and the proceeds credited upon the judgment if the defendants so desire. Their reason for claiming proportionate reduction is that the injunction tied their hands. It did prevent their selling the goods, but it did not forbid their returning them to the receiver or the trustee; and their continued withholding remained just as wrongful after as before the injunction was served. It always was within their power to turn back what they had, and because they persisted in their wrong, they cannot charge the deterioration upon the estate. They took their chances when they insisted upon a possession which the court has now found to be illegal, and the loss must fall upon their own heads.

Let a decree be submitted upon notice.