YOUNG v. GORDON et al.

In re SIFELL.

(District Court, E. D. New York. April 28, 1919.)

1. FRAUDULENT CONVEYANCES 🔑47—SALE IN BULK—PRESUMPTIVE FRAUD.

A sale of a stock of goods in bulk, where no list of the seller's creditors was furnished the buyers, was presumptively fraudulent under the New York Bulk Sales Law (Personal Property Law, § 44), though the buyers asked perfunctory questions as to the amount of debts outstanding, and embodied the replies in the bill of sale.

2. COURTS 🔑366(14)—STATE DECISIONS—CONTROLLING EFFECT.

New York decisions that the question of fact as to whether a sale in bulk was fraudulent, under New York Bulk Sales Law (Personal Property Law, § 44), is largely a matter of intent, are controlling in suit by the seller's trustee in bankruptcy to recover the proceeds of the goods sold by the bankrupt and resold by the buyers.

3. FRAUDULENT CONVEYANCES 🔑289(1)—INTENT—EVIDENCE.

In determining whether a sale of goods was fraudulent as to creditors, although generally the sale must be viewed from the standpoint of the evidence bearing on the intent of the parties at the time, if the evidence shows a continuous transaction in which the intent relates back to the time of the purchase, the rule does not apply, and subsequent events can be coupled with events preceding the acts, if there is such connecting evidence as to throw light on the original intent.

In Equity. Suit by William A. Young, as trustee in bankruptcy of Annie Sifell, bankrupt, against John Gordon and others. Decree for plaintiff directed to be entered.

Archibald Palmer, of New York City, for trustee.

Kornblueh & Hutter, of New York City, for Gordon and Schwartz.

CHATFIELD, District Judge. The bankrupt was in possession of a 3, 9, and 19 cent store, which was managed by her brother-in-law, and which she had purchased at the bankruptcy sale of the same brother-in-law, who had previously been the owner. It is evident from the testimony that the bankrupt was in financial difficulty, and that this was well known to the brother-in-law, who acted as manager and as attorney in fact throughout the entire transaction.

Both the bankrupt and the brother-in-law lived over the store, and on Saturday night, the 29th day of June, 1918, John Gordon and Harry Schwartz suddenly appeared at the store and arranged to buy the stock for $1,200. This stock, according to the defendants, was from a casual inspection worth some $1,600, while the bankrupt's brother-in-law valued it from an inventory made some time before as amounting to nearly $2,500. The first sum asked of the purchasers was $1,600, and the purchasers were told that the landlord would al-

---

🔑For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

low them to stay in the store to conduct a sale and that the rent was $60 a month. They inquired from the manager the amount of his debts, and he told them $300, intending thereby to imply the amount of his own personal obligations, and not those of his principal. But at the same time he submitted to them the unpaid bills, which were in the store, amounting to over $2,000. The purchasers made no attempt to examine them, or to question him further. They made no attempt to question the sister, but immediately proceeded to a notary, in order to have a bill of sale drawn, and insisted that a statement should be inserted in the bill of sale that the total owing was not more than $300. They then arranged to deposit this sum of $300 (which would nominally cover these outstanding bills) with a neighboring storekeeper selected by the vendor, but who turned back $200 to the buyers as soon as there was a change in the situation demanding haste. Some time was spent that night in examining the stock, and on the following (Sunday) morning the parties returned, when the brother-in-law manager notified them that they had better get the stock out of the store as quickly as possible, which they agreed to, and moved it by automobile trucks during the night of Sunday to a New York store, which was temporarily obtained for the purpose. From this store, and two other stores subsequently hired, auctions were conducted netting about $1,300.

The bankrupt seems to have plainly perpetrated a fraud on her creditors through the actions of her brother-in-law. The brother-in-law did not apply the money received from the two defendants in a fair proportionate payment of the debts. This sum would have paid substantially all the merchandise debts then outstanding. Instead of using it for this purpose, it was paid to alleged creditors, whose debts were questioned by the trustee, and used by the bankrupt and her brother-in-law for their personal expenses.

[1] The sale was presumptively fraudulent under the New York Bulk Sales Law (section 44, Personal Property Law [Consol. Laws, c. 41; chapter 45, Laws 1909]). The purchasers seem to have had in mind the decisions of the state courts under this law, such as Wallach v. Baumryter, 170 App. Div. 618, 156 N. Y. Supp. 497, and Rugen v. Mulvihill, 85 Misc. Rep. 354, 147 N. Y. Supp. 404, and to have deliberately prepared a defense in advance, by asking perfunctory questions as to the amount of debts outstanding, and by embodying the replies in the bill of sale. They seem to have reasoned that, if an approximately fair consideration were actually paid over to the vendor, the sale might be so covered up that its validity could not be attacked. They made inquiry as to the possibility of renting the store, supposedly for the purpose of conducting a sale at the place, but the circumstances show that they were all the time ready to remove the goods and try to cover up their tracks.

[2] The issue comes down sharply to one of fact. The question of fact, under the New York Personal Property Bulk Sales Law, is largely a matter of intent, as held by the New York decisions, which are controlling in that respect. Greenwald v. Wales, 174 N. Y. 141, 66 N. E. 665. It has also been held in bankruptcy cases, such as Bentley

v. Young (D. C.) 210 Fed. 202, affirmed 223 Fed. 536, 139 C. C. A. 126, that if the entire situation is such that the vendee must have known that the vendor was converting his assets into cash, without regard to the rights of creditors, the transaction is void, and that the trustee in bankruptcy can recover the value of the property sold.

[3] Upon the facts of the present case it is evident that every circumstance tended to put the purchasers upon notice and to arouse suspicion. The $300 deposited nominally to secure creditors was apparently treated as a fund by which the purchase price could be reduced if there were risk of detection before the goods were entirely taken away. No attempt was made to undo the sale at any time, but all the parties joined in trying to cover up their tracks.

In Tennant v. Dudley, 144 N. Y. 504, 39 N. E. 644, it was held that evidence of the actions of parties after fraud had been discovered could not be used as evidence of their intent prior to the completion of a transaction. In other words, a sale must be viewed from the standpoint of the evidence directly bearing upon the intent of the parties at the time, and not upon their actions under different circumstances thereafter, when an entirely different intent might be actuating their movements. But if the evidence shows a continuous transaction, in which the intent relates back to the time of the purchase, that rule of law would not apply. Subsequent events can be coupled with events preceding the acts, if there is evidence so connecting them as to throw light upon the original intent. That is the situation in the present case. The original purchase was made in such a way as to furnish a preponderance of testimony against its good faith. The actions of the parties thereafter, when matters began to develop, were entirely in consonance with what would have been expected. It may not be of itself conclusive proof as to their original intent, but it certainly does not negative a dishonest intent on their part. The sale should be set aside, and the defendants compelled to restore the value of the property.

As to this the evidence shows that a reasonable amount of expense would necessarily be incurred in turning the assets into cash. The expenses of the defendants were not unreasonable, except in so far as they involved the hiring of automobile trucks to move the goods at night and the large expense involved in transferring these goods surreptitiously.

The figures given as to the values of the goods and the net profits received are somewhat indefinite, but are certainly nearer what would have been netted to creditors, if sold at auction or by a trustee in bankruptcy, than is the inventory estimate of the bankrupt's brother-in-law, who fixed the value at $2,500. It will be held, therefore, that $1,400 represents a fair amount to the creditors, out of which they were defrauded by the acts of the defendants.

A decree for that amount may be entered.