**CHOROST et al. v. GRAND RAPIDS FACTORY SHOWROOMS, Inc. et al.**

Civ. No. 1449.

District Court, D. New Jersey.

April 19, 1948.

Milton M. Unger, of Newark, N. J., for plaintiffs.

Isadore Rabinowitz, of Paterson, N. J., for defendant Meyer Zisblatt.

Cole, Morrill & Nadell, of Paterson, N. J., for defendants Grand Rapids Showrooms, Irving Zisblatt, Rose Zisblatt, and First Rapids Furniture Co.

SMITH, District Judge.

This is a civil action brought by the plaintiffs as trustees of the Zisblatt Furniture Company, Inc., the bankrupt, to set aside the transfer of merchandise made by the bankrupt to the defendants Grand Rapids Factory Showrooms, Inc., Irving Zisblatt and Rose Zisblatt, and to recover the value thereof. It is alleged by the plaintiffs but

denied by the said defendants that the transfer was made with intent to hinder, delay and defraud creditors, in violation of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., and the laws of the State of New York.

The plaintiffs have joined an independent claim against the defendant Meyer Zisblatt for $5,768.00, which sum was admittedly received by him within four months of the bankruptcy in payment of an antecedent debt. It is alleged by the plaintiffs but denied by the defendant that this payment was preferential and voidable under the Bankruptcy Act.

## Facts

I. The Zisblatt Furniture Company, a corporation organized by one Morris Zisblatt under the laws of the State of New York (hereinafter identified as the Zisblatt Company), was and had been for many years prior to the bankruptcy engaged in the retail furniture business at 4132 Park Avenue, New York, N. Y. This business was and had been for many years also identified by the trade name "Grand Rapids Factory Showrooms" (not the corporate defendant), as appears from a certificate filed by one Lillian Zisblatt, the wife of the said Morris Zisblatt.

II. The corporate defendant Grand Rapids Factory Showrooms, Inc., (hereinafter identified as the Grand Showrooms) was organized by Morris Zisblatt under the laws of the State of New Jersey in 1938, but did not actually begin business until February or March of 1940, when it opened for business at 165 Ward Street, Paterson, N. J. Thereafter it was continuously engaged in the retail furniture business at the said address until June of 1941.

III. The Grand Showrooms was stocked with furniture removed from the Zisblatt Company between February 20 and March 27, 1940; furniture of the value of $11,700 or more was removed from the place of business of the latter to the place of business of the former. It is reasonable to infer from all of the evidence that this removal of furniture was initiated by Morris Zisblatt to defraud the creditors of the Zisblatt Company.

IV. The corporate stock in the Grand Showrooms was owned by Morris Zisblatt and Lillian, his wife, until April 2, 1940, when it was assigned by them to Irving Zisblatt, a brother, and Rose, his wife. This assignment of the corporate stock was followed immediately by the execution of an agreement between the Grand Showrooms and the Zisblatt Company, the pertinent provisions of which are quoted in the annexed appendix.

V. The Zisblatt Company transferred and delivered to the Grand Showrooms, as of April 4, 1940, the furniture previously removed from the place of business of the former to the place of business of the latter, admittedly the property of the Zisblatt Company. This transfer and delivery of furniture was purportedly made to secure contemplated loans by the Grand Showrooms to the Zisblatt Company pursuant to the terms of the agreement.

VI. The Grand Showrooms thereafter advanced to the Zisblatt Company the sum of $12,200 in four installments: $1600 on April 4, $600 on April 6, $5000 on April 8, and $5000 on April 10. These advances were made from funds previously deposited to the account of the Grand Showrooms by the defendant Rose Zisblatt. The Zisblatt Company paid $5768 of the sum thus advanced to the defendant Meyer Zisblatt, a brother of Morris and Irving, in full satisfaction of an antecedent debt. The balance, or at least a substantial part of it, was paid to other creditors.

VII. The periodical removal of furniture from the place of business of the Zisblatt Company to the place of business of the Grand Showrooms, initiated by Morris Zisblatt in February 1940, was continued until May 21, 1940; between April 10 and May 21, 1940 furniture of the value of $6204.24 was removed from the former to the latter. The Grand Showrooms advanced to the Zisblatt Company an additional sum of $2399.75 in four installments: $500 on April 18, $160.78 on May 4, $1638.-97 on May 23, and $100 on May 24.

VIII. The Zisblatt Company was adjudged a bankrupt on June 10, 1940 on the petition of its creditors filed on June 7, 1940. Tho book value of its assets was $9667.68, of which $6205 was merchandise inventory, and its liabilities exceeded $42,-000. The property of the Zisblatt Company

was subsequently appraised at $3527.45 and was sold for $3098.10 at public auction.

IX. It is apparent that during this entire period of time, from April 4, to May 21, the only merchandise acquired by the Grand Showroom was that which it acquired from the Zisblatt Company; there are no other purchases reflected in the books and records of the Grand Showrooms except minor ones. The testimony of Irving Zisblatt that furniture was purchased from the manufacturers is not supported by his books and records but is, in fact, therein contradicted. It is not without significance, however, that the purchases made by the Grand Showrooms in June of 1940 and thereafter, until the close of business in 1941, were substantial.

X. It appears from the books and records of the Zisblatt Company that in the months of February and March, immediately preceding the execution of the agreement, furniture of the value of $7272.19 was purchased from many of its present creditors. In the same months furniture of the value of $11,700 or more was removed from the place of business of the Zisblatt Company to the place of business of the Grand Showrooms. This removal of furniture obviously resulted in a noticeable depletion of the merchandise inventory of the former.

XI. It further appears from the books and records of the Zisblatt Company that in the months of April and May, immediately preceding the bankruptcy, furniture of the value of $10,400.66 was purchased from many of its present creditors. In the same months furniture of the value of $6200 was removed from the place of business of the Zisblatt Company to the place of business of the Grand Showrooms.

XII. A simple analysis of these figures discloses that the value of the furniture removed from the place of business of the Zisblatt Company to the place of business of the Grand Showrooms in the months in question was slightly in excess of the value of the furniture purchased by the former in the same months.

XIII. A careful examination of the books and records of both corporations discloses that in the months of April and May, and particularly in May, the Zisblatt Company purchased from many of its present creditors furniture which was delivered to the Grand Showrooms and then resold to its customers. It clearly appears from the "Confirmation Orders" of the former that particular items of furniture were purchased by the Zisblatt Company for customers of the Grand Showrooms. Some of the customers for whom these purchases were made, as appears from the books and records of both corporations, were: Albert Backel, Peter Brescia, Peter Condo, Jack DeFeo, Gian (John) Gonchar, Joseph Inserra, Bill Iozza, Kiminski, Joe Lano, John Luciano, and Pat Porsio. The profit realized from these transactions was retained by the Grand Showrooms and only the wholesale value of the furniture was credited against the "loans." Many of the claims filed in the bankruptcy by the creditors are predicated, at least in part, upon these purchases made in April and May.

XIV. It seems reasonable to infer from these transactions that during April and May the Grand Showrooms was nothing more than a retail outlet for the furniture purchased by the Zisblatt Company. This inference is further supported by the fact that in these months the Grand Showrooms acquired no furniture except that which was removed from the place of business of the Zisblatt Company. There are no purchases of merchandise reflected in the books of the former.

XV. It appears from an exhibit prepared by the witness Abraham Bernstein, the accountant for the trustee, that during the period from January 1, 1940 and May 31, 1940 the Zisblatt Company was operated at a gross loss of $10,891.79 and a net loss of $27,100.48. This statement would clearly indicate that in the months preceding the bankruptcy the Zisblatt Company was in a precarious financial condition, if not, in fact, insolvent. It is reasonable to infer that the gross loss was occasioned by the sale of furniture below cost.

XVI. The transfer of furniture by the Zisblatt Company to the Grand Showrooms was made with actual intent to hinder, delay and defraud the creditors of the former. The defendants Grand Showrooms and Irving Zisblatt and Rose, his wife, were not

280

purchasers in good faith but guilty participants in the fraud. There is no direct proof that these defendants were guilty of a fraudulent intent, but the evidence is surely sufficient to support such an inference. The mere fact that these defendants parted with a valuable consideration did not change the nature of the transaction.

XVII. The Zisblatt Company, while insolvent and within four months of the bankruptcy, paid $5768 to the defendant Meyer Zisblatt in full satisfaction of an antecedent debt. The evidence, however, will not support a finding that this defendant knew, or had reasonable cause to believe, that the Zisblatt Company was insolvent at the time of the payment.

## Discussion

Section 67, sub. d, of the Bankruptcy Act, 11 U.S.C.A. § 107, sub. d, is determinative of the issues raised by the claim asserted by the plaintiffs against the defendants Grand Showrooms, Irving Zisblatt and Rose Zisblatt. The pertinent provisions of this section read as follows:

"(2) Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition in bankruptcy * * * by or against him is fraudulent * * *; (d) As to then existing and future creditors, if made or incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors.

*   *   *   *   *   *

"(6) A transfer made or an obligation incurred by a debtor adjudged a bankrupt under this title, which is fraudulent under this subdivision d against creditors of such debtor having claims provable under this title, shall be null and void against the trustee, except as to a bona fide purchaser, lienor, or obligee for a present fair equivalent value: Provided, however, That such purchaser, lienor, or obligee, who without actual fraudulent intent has given a consideration less than fair, as defined in this subdivision d, for such transfer, lien, or obligation, may retain the property, lien, or obligation as security for repayment."

The trustee who seeks to avoid as fraudulent the transfer of property previously made by a bankrupt must prove by a fair preponderance of evidence that the transfer was made with intent "to hinder, delay, or defraud either existing or future creditors." The ultimate burden of proof, in accordance with commonly accepted principles, is on the trustee. The fraudulent intent of the transferor having been established by competent evidence, the transferee must prove not only that he paid a valuable consideration but also that he acted in good faith without knowledge of the fraud. Edward Hines Western Pine Co. v. First National Bank, 7 Cir., 61 F.2d 503; Hertzmark v. Lynch, 1 Cir., 54 F.2d 38; Lumpkin v. Foley, 5 Cir., 204 F. 372; Bentley v. Young, D.C., 210 F. 202, affirmed 2 Cir., 223 F. 536. The mere fact that the transferee parted with a valuable consideration will not relieve him of the consequences of the fraud unless it also appears that he had no knowledge of the fraud. Ibid.

There can be little doubt in this case that the Zisblatt Company made the transfers in question in accordance with a fraudulent scheme conceived by Morris Zisblatt. There are several undisputed facts which amply support this conclusion: the transfer of merchandise to a new place of business opened by the transferor within four months of the bankruptcy; the transfer of merchandise recently acquired; the valuation of the merchandise at less than cost; the substantial depletion by the transferor of its merchandise inventory; the purchase of merchandise by the transferor solely for shipment to the transferee and ultimate sale to its customers; the acquisition by the transferee of all of its merchandise inventory from the transferor in the months preceding the bankruptcy; the continuity of the new place of business under the management of the transferee long after the bankruptcy of the transferor; the precarious financial condition of the transferor at the time the transfers were made; the relationship of the stockholders of the transferor and transferee; and the payment of a substantial part of the consideration to a brother, in satisfaction of an

antecedent debt. It is our opinion that only inexcusable naiveté would lead one to believe that the transfers were not made with fraudulent intent.

There is no direct proof that the defendant Irving Zisblatt was guilty of "actual fraudulent intent," but it must be remembered that proof of this element necessarily rests, as it does here, upon circumstantial evidence, that is, evidence of facts and circumstances from which an actual fraudulent intent must be inferred. It is difficult to believe that this defendant, who negotiated the "loan" and thereafter managed the Grand Showrooms, had no knowledge of the fraud. The facts and circumstances of the transaction were sufficient to put the reasonably prudent person on inquiry. If this defendant did not know of the fraud, as he seems to suggest in his defense, it was only because he willfully ignored the many facts which pointed to the fraudulent scheme of his brother. It is reasonable to infer, under these circumstances, that this defendant was likewise guilty of fraudulent intent; his willful ignorance would surely not excuse it.

■ This defendant may invoke subdivision (6) of the pertinent section only upon proof that he was "a bona fide purchaser, lienor, or obligee for a present fair equivalent value." The very term "good faith" presupposes not only a lack of knowledge of the fraud but also a lack of knowledge of such facts as would put the reasonably prudent person on inquiry. Edward Hines Western Pine Co. v. First National Bank; Hertzmark v. Lynch; Lumpkin v. Foley; Bentley v. Young, supra. The personal good faith of the defendant will not avail him as a defense if he acted with full knowledge of facts and circumstances which put him on inquiry.

The defendant Rose Zisblatt did not testify on her own behalf and offered no evidence except that which was offered in support of the defense interposed by the defendant Irving Zisblatt, her husband.

The claim asserted by the plaintiffs against the defendant Meyer Zisblatt is predicated upon Section 60 of the Bankruptcy Act, 11 U.S.C.A. § 96. It is admitted that the bankrupt, within four months of the bankruptcy, made a payment to this defendant on account of an antecedent debt. It is denied, however, that this defendant knew or had reasonable cause to believe that the bankrupt was insolvent at the time the payment was made.

■ A preference may be avoided under the Act only "if the creditor receiving it * * * has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent." 11 U.S.C.A. § 96, sub. b. The term "reasonable cause to believe" presupposes a knowledge of such facts as would produce in the mind of a reasonably intelligent person a well-founded belief as opposed to a mere suspicion.

■ It is our opinion that the evidence presented by the plaintiffs will not support a determination that this defendant knew or had reasonable cause to believe that the bankrupt was insolvent when the payment was made. The claim asserted against this defendant must, therefore, be dismissed.

## Conclusions

I. The transfer of furniture by the Zisblatt Company to the Grand Showrooms was made with intent to hinder, delay, and defraud existing and future creditors within the meaning of the Bankruptcy Act, and particularly Section 67, sub. d, thereof. This transfer was null and void against the trustee.

II. The defendants Irving Zisblatt and Rose Zisblatt, having acquired the furniture with knowledge of the fraud or with knowledge of facts and circumstances which put them on inquiry, were not bona fide purchasers within the meaning of the Act. These defendants knowingly participated in the fraudulent scheme, and a fraudulent intent must be imputed to them.

■ III. The fraudulent intent imputed to the defendants Irving Zisblatt and Rose Zisblatt must be imputed to the defendant Grand Showrooms, of which they were the sole stockholders.

IV. A judgment in the amount of $14,600 will be entered in favor of the plaintiffs and against the defendants Grand Showrooms, Irving Zisblatt and Rose Zisblatt.

This amount represents the wholesale cost of the merchandise, less the discounts allowed by the Zisblatt Company to the Grand Showrooms. It is our opinion that this is a fair and equitable award under the facts of this case.

V. The payment by the bankrupt to the defendant Meyer Zisblatt was not a voidable preference within the meaning of the Bankruptcy Act. The claim against this defendant will, therefore, be dismissed.

### Appendix

"Grand Rapids Factory Showrooms, Inc., a corporation, (hereinafter referred to as Grand Rapids) and,

"Zisblatt Furniture Co. Inc., a corporation, (hereinafter referred to as Zisblatt), for and in consideration of the mutual promises hereinafter contained and all the acts and deeds hereinafter set out, stipulate, agree and covenant one with the other that,

\* \* \*

"Whereas, Zisblatt is desirous of making loans from time to time from Grand Rapids and is ready, able and willing to deliver and pledge with Grand Rapids as collateral security for such loans, various articles of furniture, merchandise and chattels from time to time as such loans shall be made to it by Grand Rapids, now, therefore, it is agreed, stipulated, covenanted and contracted between the parties, that:

"1. Grand Rapids will loan and advance to Zisblatt from time to time such sum or sums of money as Zisblatt shall request and require for use in its business between the date of this contract and July 15th, 1940.

"2. Grand Rapids shall have the right, prerogative and privilege to refuse to make such loan or loans in any sum or sums as requested by Zisblatt if it shall deem itself unable to furnish such sum or sums if in its judgment its security shall be or may become impaired by virtue of the making of such loan or loans.

"3. As a condition concurrent with the making of the loan or loans of any sum or sums by Grand Rapids to Zisblatt, Zisblatt agrees that it will deliver to Grand Rapids and pledge with Grand Rapids a sufficient amount of furniture, merchandise and chattels which furniture, merchandise or chattels shall be held and retained by Grand Rapids as and for collateral security for the repayment by Zisblatt to Grand Rapids of any and all sum or sums of money advanced by Grand Rapids to Zisblatt; such furniture, chattels and merchandise shall also be held by Grand Rapids as collateral security for the payment of interest at the rate of six (6%) per cent per annum upon all such and any such loans.

"4. Zisblatt further agrees and covenants that the valuation of the furniture to be placed by it with Grand Rapids as collateral security for the repayment of such loan or loans shall be fixed and determined by the wholesale replacement value thereof and that in no event shall the valuation of such furniture, chattels and merchandise transferred by Zisblatt to Grand Rapids by way of collateral security exceed the net cost to Zisblatt of such furniture, merchandise or chattels.

"5. Zisblatt agrees that it will repay any sum or sums loaned to it by Grand Rapids on or before the 15th day of July, 1940 together with interest at the rate of six (6%) per cent per annum to be computed, however, on the basis of the amount of money outstanding and due from Zisblatt to Grand Rapids for such period on such sum or sums as shall remain unpaid.

\* \* \* \* \* \*

"7. Zisblatt agrees that Grand Rapids shall have the right, option and privilege at any time prior to payment by Zisblatt of the full amount which shall be due to Grand Rapids from Zisblatt to sell and dispose of any furniture, merchandise or chattels which Grand Rapids has in its possession as collateral security for the repayment of such loan on the following terms, and conditions, however:

"(A) That Grand Rapids is in no event to sell, transfer or dispose of any furniture, chattels or merchandise for a sum which shall be less than the value placed thereon by the parties in manner set forth in paragraph #4.

"(B) In the event that Grand Rapids shall sell any of the pledged furniture, chattels, or merchandise held by it as collateral security for repayment of loan made by it, then and in that event the sum or sums

realized from such sale or sales shall be credited to the account of Zisblatt subject, however, to the following deductions, to wit: (35%) thirty-five percent of the sale price of such merchandise, furniture or chattels, which thirty-five (35%) per cent shall be allowed to Grand Rapids in compensation for overhead, selling expenses and all other charges in connection with the sale or sales of such furniture; but in no event shall such sum be less than value as fixed by terms of paragraph 4.

\* \* \* \* \* \*

"9. Zisblatt agrees that all sales to be made of furniture delivered by it to Grand Rapids as collateral security shall be made in the name of Grand Rapids and that the purchase price of such sales shall be payable only to Grand Rapids.

\* \* \* \* \* \*

"11. Zisblatt agrees to deliver to Grand Rapids furniture, merchandise and chattels as collateral security for any loans made or to be made, free and clear of all liens and encumbrances; Zisblatt also further agrees to pay for all delivery charges for such furniture, merchandise and chattels."